QUINCY PARK CONDOMINIUM
UNIT OWNERS' ASSOCIATION,
Petitioner,

v.

DISTRICT OF COLUMBIA BOARD
OF ZONING ADJUSTMENT,
Respondent,

and

Morrison–Clark Limited Partnership
I, et al., Intervenors.

No. 09–AA–70.

District of Columbia Court of Appeals.

Argued March 2, 2010.
Decided Sept. 30, 2010.

Benny L. Kass, Washington, DC, for petitioner.

Peter J. Nickles, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, filed a statement in lieu of brief for the District of Columbia.

Paul J. Kiernan, with whom Christopher H. Collins, Washington, DC, and Jennifer A. Short, McLean, VA, were on the brief, for intervenors.

Charles D. Reed was on the brief for amicus curiae Advisory Neighborhood Commission 2F.

Before WASHINGTON, Chief Judge, and REID and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

Quincy Park Condominium Unit Owners' Association ("Quincy Park" or the "Association") petitions for review of a Board of Zoning Adjustment ("BZA") decision approving the expansion of the Morrison–Clark Hotel, Quincy Park's neighbor. The Association complains that the BZA failed to accord "great weight" to the opposition expressed by the local Advisory Neighborhood Commission ("ANC") when that body retracted its initial recommendation in favor of the project and asked the BZA to reconsider its decision. In addition, the Association raises due process and equal protection challenges to the BZA rule of procedure allowing notice of the proceedings to be mailed to the Association rather than directly to each of its members. We conclude that the Association's claims lack merit, and we dismiss its petition for review and affirm the BZA's order.

## I. Background

Intervenors, Morrison–Clark Limited Partnership I and Morrison–Clark LP (collectively "Morrison–Clark"), embarked in 2006 on a project to enlarge the Morrison–Clark Hotel in downtown Washington, D.C. The plans for the project involved expanding the hotel into adjacent property formerly occupied by the Chinese Community Church. The construction would extend to the property line, and the rear wall of the new structure therefore would be three feet from the south wall of the Quincy Park condominium building.

In order to proceed with its plans, Morrison–Clark needed to apply to the BZA for zoning variances and a special exception. Before doing so, Morrison–Clark presented its project to ANC 2F, the ANC for the neighborhood in which the hotel was located. It provided ANC 2F with a siting map and floor plans indicating that the project would extend to the property

line. The documents did not depict the adjacent buildings, however, or otherwise make evident how close the hotel's new annex would come to the Quincy Park condominium. Apparently without appreciating that fact, ANC 2F's Community Development Committee unanimously approved the project, and the full ANC voted in favor of recommending that the BZA grant Morrison–Clark's application for zoning relief.

Thereafter, on September 13, 2007, Morrison–Clark applied to the BZA for a use variance, variances from rear-yard setback and nonconforming structure requirements, and a special exception from roof structure setback requirements. A public hearing on the project was scheduled for March 11, 2008. Two months before that date, the Director of the Office of Zoning certified, in accordance with the BZA's Rules of Practice and Procedure, that notice of the hearing had been mailed to all interested parties, including ANC 2F and all owners of property located within 200 feet of the project. This included notice to Quincy Park. That notice was mailed to the Association rather than to each one of the approximately ninety unit owners at the condominium pursuant to 11 DCMR § 3113.13(b) (2000), which states that "in the case of a residential condominium or cooperative with twenty-five (25) or more dwelling units, mailed notice may be provided to the board of directors or to the association of the condominium or cooperative that represents all of the owners of all the dwelling units." As required by the BZA's rules, Morrison–Clark also posted notice of the hearing on its property.[1]

In February, after receiving a revised set of plans for the hotel expansion project (which, like the original set, did not show the proximity of the new addition to the Quincy Park condominium), ANC 2F again voted to support Morrison–Clark's application. The ANC sent the BZA a report explaining its recommendation. The report raised no issues or concerns. Two weeks before the hearing, Morrison–Clark sent ANC 2F a copy of its pre-hearing report. (The documents included in this pre-hearing report may have depicted Quincy Park's location in relation to the proposed construction, but if the ANC was aware of that fact, it did not react to it.)

No one representing either ANC 2F or the Association attended the hearing on March 11. The only Quincy Park unit owner present at the hearing was Mary Busenberg. She stated that she had learned of the proceeding from the placard posted on Morrison–Clark's property and was uncertain whether any other unit owners were aware of it. Ms. Busenberg expressed concern that the law permitted notice to be mailed to a condominium unit owners' association, as it was in this case, rather than directly to each individual unit owner. She stated that she was not necessarily opposed to the Morrison–Clark project, but was concerned about its impact on Quincy Park residents, including the loss of light and airflow on the south side of the condominium building due to the proximity of the new construction.

During the hearing, the concerns Ms. Busenberg raised were evaluated and ANC 2F's support for Morrison–Clark's application was noted. Ultimately, the BZA members were impressed with the merits of the project and were satisfied that it would have no substantial detrimental impact on its neighbors. At the conclusion of the hearing, which the Chairperson described as having created "a very, very full and comprehensive record," the BZA approved Morrison–Clark's request for zoning relief. In a summary order effectuating that decision, the BZA stated that it

---

1. *See* 11 DCMR § 3113.14–15 (2000).

had given "great weight" to ANC 2F's recommendation.

On April 2, 2008, ANC 2F held its next regularly scheduled meeting. A Quincy Park board member attended that meeting and requested that the ANC rescind its approval of the Morrison–Clark project because the March 11 hearing had revealed that the new structure would be unacceptably close to the Quincy Park building. The ANC voted in favor of withdrawing its prior approval. A week later, the Chairman of ANC 2F submitted a motion to the BZA requesting a rehearing and reconsideration of Morrison–Clark's application for zoning relief. The motion asserted that "the facts presented and reviewed by the ANC during its initial review of the application were substantially different than those revealed by the Applicant during the March 11, 2008 hearing before the BZA." More specifically, the ANC claimed it had been misled because the plans it had reviewed did not depict the proximity of the proposed construction to the Quincy Park condominium. In addition, the ANC charged that the evidence at the March 11 hearing contradicted statements Morrison–Clark had made to the ANC, including the developer's assurances that the condominium owners had been informed of its plans. "Had the ANC been made aware of the actual relationship of the construction to, and its impact upon, the adjoining property ... when the ANC considered this Application," the motion stated, "it is virtually certain that it would have determined that the Applicant failed to meet the statutory requirements for the requested variances, rather than advising the BZA to grant the application, as it did" in February 2008. Accordingly, ANC 2F sought rehearing so that the BZA could receive additional evidence as to the project's impact on the adjacent property, along with a new recommendation from the ANC regarding the application.

The BZA denied the request for a rehearing, finding that ANC 2F had proffered no evidence "that could not reasonably have been presented at the original hearing" on March 11.[2] However, the BZA agreed to reconsider the application, without taking new evidence, at a special public meeting on May 27, 2008. At that meeting, the BZA re-assessed the issues raised in ANC 2F's motion, including the proximity of the new construction to the Quincy Park building and the adequacy of the notice given to the condominium owners. While acknowledging an obligation to accord "great weight" to ANC 2F's belated concerns, the BZA declined to change its decision, and it denied the motion for reconsideration.[3]

After receiving the BZA's order denying reconsideration, the Association filed a timely petition for review by this court.

2. The BZA's rules of procedure provide that "[n]o request for rehearing shall be considered by the Board unless new evidence is submitted that could not reasonably have been presented at the original hearing." 11 DCMR § 3126.6 (2000).

3. In its written order summarizing its conclusions, the BZA explained that it had considered the proximity issue in depth in its original deliberations, and it found no reason to retreat from its earlier conclusions. The BZA noted, among other things, that none of the windows on the south wall of the Quincy Park building would be blocked completely; that "due to Building Code restrictions, windows on this south-facing wall should not be relied on to provide required light and ventilation to their condominium units"; and that "any effect on light and air will be minimal."

As to the question of notice, the BZA acknowledged that "[t]he unit owner who testified at the [March 11] hearing claimed generally that the unit owners had not been kept informed of the evolution of the Applicant's project and the ANC's motion states that there had been no notice to the unit owners of any meetings with the Applicant." Nonetheless, the unit owner "appeared at the hearing, because the property was properly posted"; and as "proper notice was sent to the condomini-

## II. Discussion

Quincy Park presents two main claims: (1) that by denying ANC 2F's request for a rehearing on Morrison–Clark's application, the BZA breached its statutory obligation to give "great weight" to the ANC's issues and concerns; and (2) that the BZA rule allowing notice of the hearing on Morrison–Clark's application to be mailed to the Association, rather than directly to the individual unit owners, is unconstitutional on its face, as it deprives unit owners of due process and equal protection of the laws. Although the Association did not participate in the proceedings before the BZA, it has standing to represent its members' interests and is not estopped from presenting the foregoing claims, which were raised (or at least adumbrated) by others in the course of the administrative proceedings.[4] We reject those claims on their merits, however.

### A. The BZA's Compliance with the "Great Weight" Requirement

■ When an application for a special exception or a variance is submitted to the BZA, the ANC for the affected neighborhood is entitled to be notified so that it may consider the application and advise the BZA in writing of its position.[5] "The issues and concerns raised in the recommendations of the [ANC] shall be given great weight during the deliberations by the [BZA]."[6]

The Association contends that this statutory requirement obligated the BZA to grant ANC 2F's motion for rehearing. We disagree. As the phrase "during the deliberations" indicates, the statute contemplates that the ANC's position will be heard and considered as part of the agency's deliberative process, not after that process has been completed. In conformity with that intent, the BZA's Rules of Practice and Procedure require the ANC to submit its written report *before* the hearing at which the deliberations will take place.[7] The only timely written report that ANC 2F submitted to the BZA in this case was its letter supporting Morrison–Clark's application. The Association does not deny that the BZA attached great weight to that letter during its delibera-

---

um board and all other applicable methods of notice listed in subparagraphs 3113.13(a)-(e) were also performed," the BZA found "no failure as to proper notice."

4. *See Tiber Island Coop. Homes, Inc. v. District of Columbia Zoning Comm'n,* 975 A.2d 186, 192 n. 6 (D.C.2009) ("[O]ur case law recognizes that neighbors whose everyday views would be affected by a proposed development are precisely the sort of people who have a sufficiently concrete and particularized interest in a zoning project to have standing to challenge that project in this court.") (citing cases); *York Apartments Tenants Ass'n v. District of Columbia Zoning Comm'n,* 856 A.2d 1079, 1085 n. 6 (D.C.2004) (explaining that if tenants' association had alleged actual injuries suffered by its members, so as to support its standing to seek review, it would not have been estopped from presenting its

claims to this court merely because it did not participate in the administrative proceedings below, so long as the issues were raised by some other party or the agency in fact considered them).

5. *See* D.C.Code § 1–309.10 (2006).

6. *Id.* § 1–309.10(d)(3)(A); *see also Neighbors United for a Safer Cmty. v. District of Columbia Bd. of Zoning Adjustment,* 647 A.2d 793, 798 (D.C.1994) ("The 'great weight' requirement pertains only to the *written recommendations* of the affected ANC and not to its oral testimony.") (internal quotation marks and brackets omitted).

7. 11 DCMR § 3115.1 (2000) ("The written report of the ANC shall be submitted to the Board at least seven (7) days in advance of the hearing.").

tions. ANC 2F's rehearing motion obviously came too late to be considered during the BZA's deliberations. It was not the written advice contemplated by the statute and the BZA's rules, and the BZA therefore was under no statutory obligation to give it "great weight" in reconsidering the decision it had made.

That ANC 2F claimed in its motion that it had been misled in its initial evaluation of the Morrison–Clark project makes no difference to our conclusion.[8] The BZA's rules provide for just such contingencies:

> In the event the ANC submits its report on the basis of understandings, agreements, or meetings with the appellant or applicant that later are modified by the appellant or applicant, the designated ANC representative may comment orally concerning the specific inconsistencies. No other new matters may be presented orally by the designated ANC representative.[9]

By failing to send a representative to the March 11 hearing, ANC 2F lost the opportunity provided by this rule to comment on the alleged differences between Morrison–Clark's actual application and the ANC's understanding of the project's impact.

Nonetheless, the BZA excused the ANC's default: by holding a public meeting on the post-hearing motion, the BZA allowed the ANC to be heard to the same extent as if it had appeared at the original hearing. And whether it was obliged by law to do so or not, the BZA undertook to give great weight to each of the issues and concerns belatedly raised by the ANC. In so doing, the BZA certainly was not required to "accept the views of the ANC no matter what. All that the law demands is that the views of the ANC be specifically addressed, and not ignored or overlooked, in the BZA's decision."[10] The BZA met this standard in its decision denying reconsideration. The BZA was not required to grant rehearing for the purposes of receiving new evidence. As previously noted, the BZA's rules provide that "[n]o request for rehearing shall be considered by the Board unless new evidence is submitted that could not reasonably have been presented at the original hearing."[11] The ANC did not satisfy this condition; its motion relied solely on the evidence that not only could have been but actually was presented at the original hearing.[12]

## B. The Constitutional Challenges to 11 DCMR § 3113.13(b)

 We turn to the Association's facial challenges to the constitutionality of 11 DCMR § 3113.13(b), the rule that requires the Office of Zoning to mail notice of the hearing before the BZA on a zoning application to the owners of all property within 200 feet of the property involved in the application.[13] The Association argues that

---

**8.** It should be noted that Morrison–Clark denies have misled the ANC in any respect. This is a dispute we have no need to enter.

**9.** 11 DCMR § 3115.3 (2000).

**10.** *Foggy Bottom Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 791 A.2d 64, 77 (D.C.2002); *see also* D.C.Code § 1–309.10(d)(3)(A), (B).

**11.** 11 DCMR § 3126.6 (2000).

**12.** As "new evidence," the ANC cited "the information presented by the Applicant to the

BZA at the hearing on March 11, 2008," and the "withdrawal of its approval of the proposed construction," which was based on that information.

**13.** As this court has noted recently, "[b]road, facial challenges to the constitutionality of a statute impose a heavy burden on the parties and rarely succeed." *Plummer v. United States,* 983 A.2d 323, 338 (D.C.2009). Ordinarily, the Supreme Court has stated, a litigant may succeed with a facial attack only by "establish[ing] that no set of circumstances exists under which the Act would be valid."

the proviso in § 3113.13(b), allowing notice to be mailed to a unit owners' association instead of to each individual owner if there are twenty-five or more dwelling units in the condominium, deprives such unit owners of their Fifth Amendment rights to due process and equal protection of the laws.[14] We are not persuaded. We assume *arguendo* that neighboring unit owners have protected property interests at stake, so as to be entitled to notice of the hearing as a matter of due process. Even so, notice to the unit owners' association is constitutionally sufficient because the association's officers are the owners' fiduciaries, and thus it is reasonable to rely on those officers to inform the owners of the hearing.[15] And while the notice rule treats unit owners in buildings with twenty-five or more units differently from owners in buildings with fewer units (who are entitled to individual notice), the distinction is rationally related to a legitimate governmental interest and hence does not deprive

the former group of equal protection of the laws.

▮▮▮ In any proceeding that will affect a constitutionally-protected interest in life, liberty or property, due process requires "notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections."[16] Constructive notice by means such as posting or publication in a newspaper may be valid where the identity or location of interested parties is unknown and difficult to determine. But "[n]otice by mail or other means as certain to ensure actual notice is a minimum constitutional precondition to a proceeding which will adversely affect the liberty or property interests of *any* party ... if its name and address are reasonably ascertainable."[17] The "other means" that meet this standard include notice to persons

---

*Washington State Grange v. Washington State Republican Party,* 552 U.S. 442, 449, 128 S.Ct. 1184, 170 L.Ed.2d 151 (2008) (quoting *United States v. Salerno,* 481 U.S. 739, 745, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)). Even if that articulation is subject to some qualification, there is no question that a facial challenge must fail where the statute has a "plainly legitimate sweep." *Id.* (quoting *Washington v. Glucksberg,* 521 U.S. 702, 739–40, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) (Stevens, J. concurring in judgment)).

14. The right to equal protection of the laws is guaranteed to citizens of the District of Columbia through the Fifth Amendment guarantee of due process of law. *See Bolling v. Sharpe,* 347 U.S. 497, 499–500, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

15. The Association admits that it received the notice mailed to it in this case; it has not explained what, if any, actions it took in response. For aught we know, notwithstanding Ms. Busenberg's representations at the March 11 hearing before the BZA, the Association notified its members of the proceeding.

16. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

17. *Mennonite Bd. of Missions v. Adams,* 462 U.S. 791, 800, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983). The holding of *Mennonite* is not limited, as Morrison–Clark argues, to tax sale proceedings. The case took its place in a long line of Supreme Court decisions adhering to the broad principle that the same fundamental notice requirements apply regardless of the nature of the proceeding. *See id.* at 796 n. 3, 103 S.Ct. 2706 (citing *Mullane* and subsequent cases rejecting traditional distinctions based on the type of action or residency). Accordingly, we have followed *Mennonite* in non-tax cases. *See In re Estate of Bryant,* 793 A.2d 487, 492 (D.C.2002) (holding executor of estate obligated to make reasonably diligent efforts to identify creditors and provide them actual notice); *Estate of Underwood v. Nat'l Credit Union Admin.,* 665 A.2d 621, 629 (D.C.1995) (holding claimants against a failed credit union entitled to individual notice of the statutory administrative claim period).

who reasonably can be relied upon to inform the interested parties. For example, sending certified mail to a federal prison in which the interested party is incarcerated is sufficient due process because it is reasonable to rely on prison staff to deliver the mail to the prisoner.[18] Similarly, Superior Court Civil Rule 4(e)(2) and its federal counterpart long have allowed delivery of notice of a lawsuit to be made to a person of "suitable age and discretion" residing at the same abode as the individual entitled to notice.[19] The touchstone is reasonableness: the Due Process Clause "does not require ... heroic efforts" and "[Supreme Court] cases have never required actual notice."[20]

Under District of Columbia condominium law, the "self-government of the condominium" is in the hands of the unit owners' association.[21] The association has broad powers to protect its members' property interests in the condominium—including, notably, the power to intervene in administrative proceedings on behalf of the unit owners "on any matter that affects the condominium."[22] In performing their duties, the association's officers or executive board members are required by statute to "exercise the care required of a fiduciary of the unit owners."[23] Given the duties of loyalty and care imposed by law on a fiduciary,[24] it is reasonable to rely on a condominium unit owners' association to inform all its members when it is notified of an application before the BZA for a variance or special exception that could affect the value of the unit owners' condominium property. Notice to the condominium association serves as the practical equivalent of notice to the individual owners, and it therefore comports with due process.[25]

**18.** *Dusenbery v. United States,* 534 U.S. 161, 172–73, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002).

**19.** *See* Super. Ct. Civ. R. 4(e)(2); Fed.R.Civ.P. 4(e)(2)(B); *United States v. One Urban Lot Located at 1 Street A–1,* 885 F.2d 994, 998–99 (1st Cir.1989) (holding that service on the daughter-in-law of the defendant satisfies due process); *Jones v. Hersh,* 845 A.2d 541, 546 n. 6 (D.C.2004) ("It is beyond dispute that [due process] is satisfied when service on an individual [above the age of sixteen who was residing in defendant's home] is accomplished."); *see also McDonald v. Mabee,* 243 U.S. 90, 92, 37 S.Ct. 343, 61 L.Ed. 608 (1917) (suggesting that service upon the defendant's family at his last and usual place of abode would satisfy due process).

**20.** *Dusenbery,* 534 U.S. at 170–71, 122 S.Ct. 694.

**21.** D.C.Code § 42–1903.01(a) (2001).

**22.** *Id.* § 42–1903.08(a)(4) (2001).

**23.** *Id.* § 42–1903.08(d).

**24.** *See, e.g., Willens v. 2720 Wisconsin Ave. Coop. Ass'n,* 844 A.2d 1126, 1136 (D.C.2004) (discussing fiduciary duty of loyalty owed by directors of a residential cooperative to its shareholders); *see generally* RESTATEMENT (THIRD) OF AGENCY § 8.01 ("An agent has a fiduciary duty to act loyally for the principal's benefit in all matters connected with the agency relationship."); § 8.08 ("[A]n agent has a duty to the principal to act with the care, competence, and diligence normally exercised by agents in similar circumstances."); § 8.11 ("An agent has a duty to use reasonable effort to provide the principal with facts that the agent knows, has reason to know, or should know when (1) ... the agent knows or has reason to know that the principal would wish to have the facts or the facts are material to the agent's duties to the principal.") (2006).

**25.** That the condominium association may breach its fiduciary duty and neglect to inform its members of the notice it received does not mean the members are deprived of due process. *See Nelson v. City of New York,* 352 U.S. 103, 108, 77 S.Ct. 195, 1 L.Ed.2d 171 (1956) ("We conclude, therefore, that the City having taken steps to notify appellants of the arrearages and the foreclosure proceedings and their agent having received such notices, its application of the statute did not deprive appellants of procedural due process.").

■ The Association's equal protection challenge to 11 DCMR § 3113.13(b) fares no better. The Association contends that the notice rule arbitrarily discriminates against unit owners in condominiums with twenty-five or more dwelling units, inasmuch as it requires individual mailed notice to owners in buildings with fewer than twenty-five units. As the rule does not discriminate against members of a suspect class (such as race), we must presume it to be valid and will sustain it so long as the classification "is rationally related to a legitimate [government] interest."[26] If the government's interest is legitimate, appellate review of the classification "is limited to ascertaining whether any state of facts either known or which could reasonably be assumed affords support for it."[27]

The exception for condominiums with twenty-five or more units rationally serves at least two legitimate governmental interests: ensuring that notice is provided to individual unit owners without fail, and reducing administrative burdens. As the number of dwelling units in a condominium increases, it is rational to suppose that it becomes correspondingly easier and less burdensome for the unit owners' association to identify and locate each of its members accurately and expeditiously, and to transmit a notice of impending administrative proceedings to each and every one of them, than for the Office of Zoning (or a third party) to accomplish those tasks. Given that notice must be furnished to neighboring property owners in every case before the BZA, reducing the burden on the Office of Zoning when neighboring condominiums have many unit owners is a significant benefit. The Association asserts that it is arbitrary to draw the line at buildings with twenty-five dwelling units as opposed to some other number of units. That may be, but to achieve the goal, the line must be drawn somewhere, and we cannot say it is drawn irrationally in 11 DCMR § 3113.13(b).[28] We therefore find no constitutional infirmity in the notice provision.

### III. Conclusion

For the foregoing reasons, we hold that the BZA did not violate its statutory obligation to accord "great weight" to the issues and concerns properly raised by the ANC with respect to Morrison–Clark's application for zoning relief; and that the BZA's rule permitting notice to be mailed to a condominium unit owners' association, rather than directly to each individual owner if the condominium has twenty-five or more units, is not unconstitutional on its face. Accordingly, we dismiss the petition for review and affirm the BZA's order denying rehearing and reconsideration of its decision to grant Morrison–Clark's application.

*So ordered.*

---

**26.** *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985).

**27.** *In re Dulansey*, 606 A.2d 189, 190 (D.C. 1992) (internal quotation marks and citations omitted).

**28.** The justification for judicial restraint in affording rational basis review applies with particular force "where the legislature must necessarily engage in a process of line-drawing." *FCC v. Beach Communications*, 508 U.S. 307, 315, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993) (quoting *United States R.R. Retirement Bd. v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980)). "Defining a class of persons subject to a regulatory requirement ... inevitably requires that some persons who have almost equally strong claim to favored treatment be placed on different sides of the line." *Id.* at 315–16, 113 S.Ct. 2096 (internal quotation marks omitted).