*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 17-AA-0360

SHARON COLE, PETITIONER,

v.

DISTRICT OF COLUMBIA ZONING COMMISSION, RESPONDENT,

and

777 17TH STREET, LLC, INTERVENOR.

Petition for Review of a Decision of
the District of Columbia Zoning Commission
(ZC15-31)

(Submitted January 31, 2019                                    Decided June 27, 2019)

Sharon Cole, *pro se.*

*Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, *Stacy L. Anderson*, then Acting Deputy Solicitor General, and *Richard S. Love*, Senior Assistant Attorney General, filed a statement in lieu of brief for respondent.

*Allison C. Prince*, *Christine A. Roddy*, and *Alana V. Rusin* were on the brief for intervenor.

Before THOMPSON and MCLEESE, *Associate Judges*, and WASHINGTON, *Senior Judge*.

THOMPSON, *Associate Judge*: On December 17, 2015, 777 17th Street, LLC, (the "applicant" or the "Intervenor") submitted to the Zoning Commission (the "Commission") an application for review and approval of a consolidated planned-unit development ("PUD") and a PUD-related zoning map amendment.[1] The application proposed construction of a mixed-use residential/ground-floor-retail development at 1701 H Street, N.E., located at the intersection of Benning Road, 17th Street, and H Street, N.E. The building (ten floors at its greatest height on the west end, and six floors at its eastern end) would be constructed on lots that currently are an unimproved, vacant lot and a used-car lot. The planned residential component would consist of approximately 180 rental units, with eight percent of the residential floor space set aside for affordable-housing units (referred to by the Commission as "IZ," i.e., "inclusionary zoning," units) for the life of the development.[2]

---

[1] The applicant is also referred to in the record as Capital City Real Estate.

[2] Specifically, under the PUD application as approved by the Commission, approximately 11,468 square feet out of 143,338 square feet (eight percent of the residential gross floor area) would be inclusionary-zoning units, with 50% of the inclusionary-zoning units (no fewer than 6 units) reserved for households earning up to 50% of the area median income and the other 50% reserved for households earning up to 80% of the area median income.

Petitioner Sharon Cole, who resides in a building adjacent to the proposed construction site, seeks review of the Commission's decision approving the application, which was published on March 10, 2017.[3] For the reasons discussed below, we affirm the Commission's decision.

## I.

The District of Columbia Office of Planning ("OP") submitted a report on April 1, 2016, recommending that a public hearing on the PUD application be held, and filed its final report on September 19, 2016, recommending approval of the application. The Commission held a public hearing on the application on September 29, 2016, during which petitioner Cole testified in opposition.[4] At a

---

[3] *See* 64 D.C. Reg. 2640 (Mar. 10, 2017).

[4] One other neighbor of the Project also spoke in opposition, and petitioner submitted opposition letters from additional neighbors. One entity (Equitable and Respectful Investment) submitted comments expressing concern about "redevelopment of the area," particularly about "repurposing or demolition of" the AFH Healthcare Center and Hechinger Mall (neither of which is involved in the PUD application), and asserting that gentrification damages communities by "strip[ping] the community of access to their land, their buildings, their routines and traditions and public space." Two neighbors and H Street Main Street submitted letters in support of the application, and Advisory Neighborhood Commission ("ANC") 6A also submitted a letter of support. (After the public hearing, ANC 5D voted to support the application, reasoning that the PUD would

(continued…)

subsequent public meeting, the Commission approved the application, finding that the PUD will provide public benefits of "exceptional quality" and of "substantial value to the community" and that the concerns noted by those who testified in opposition to the application were adequately addressed.

In its 23-page ruling, the Commission credited the assessment by OP that the PUD complies with the District of Columbia Comprehensive Plan,[5] which is intended to "[g]uide executive and legislative decisions on matters affecting the District and its citizens[.]"  D.C. Code § 1-306.01(b)(2) (2016 Repl.).  The Commission also found that the PUD will promote the policies of the Comprehensive Plan's Land Use, Transportation, Environmental, Housing, and Urban Design Citywide Elements and its Upper Northeast Area Element[6] by,

---

(…continued)
"add[] affordable units and other community benefits" (though ANC 5D members expressed "concern about the building's proposed height")).

[5]  *See* 10-A DCMR §§ 100-2500 (2015).

[6]  In reviewing the PUD application, the Commission was to consider "the compatibility of the proposed development with city-wide, ward, and area plans of the District of Columbia . . . ."  11 DCMR § 2402.2(a) (2015).

New zoning regulations "supersed[ing] in full the 1958 regulations and zoning maps that had been in effect, as amended," became effective on September 6, 2016.  *Ait-Ghezala v. District of Columbia Bd. of Zoning Adjustment*, 148 A.3d

(continued…)

among other things, bringing mixed-income housing and retail uses within walking distance of the H Street streetcar (thus "capitaliz[ing] on the Property's transit-oriented location") and implementing policies that encourage "growth and revitalization to an underutilized lot along a high transit corridor," that expand the city's supply of affordable, family-size units and "provide deeper affordability limits," and that enhance the aesthetic appeal of a major thoroughfare within the District.[7] The Commission also found that the PUD is compatible with and

_____

(…continued)

1211, 1214 n.2 (D.C. 2016); 11-A DCMR § 100.3 (2016). However, in describing what the Commission was to consider, we cite the now-superseded regulations that governed the Commission's substantive review of the PUD application. *See, e.g.*, 64 D.C. Reg. 12515, 12515, 12515 n.2 (Dec. 8, 2017) (Zoning Commission order explaining that "[t]he [PUD] standards of Chapter 24 [i.e., section 2405 of the 1958 Zoning Regulations] and the substantive requirements of the 1958 Zoning Regulations were used [to review the subject PUD application] because the Application was filed prior to the date that those regulations were repealed").

[7] Petitioner asserts that the PUD will include "no family sized units." This appears to be incorrect. The original proposal stated that the PUD would include studio and one- and two-bedroom units, but did not mention three-bedroom units. The Comprehensive Plan appears to assume that family-sized units are those with three or more bedrooms. *See, e.g.*, 10-A DCMR § 505.4 (2015) ("Families with children may seek homes with three or four bedrooms. . . ."). Under the application as approved by the Commission, the Intervenor is to ensure that half of the inclusionary units are two- or three-bedroom units, and that 60% of the units set aside for households earning up to 50% of the area median income are two- or three-bedroom units. Without more, the "or" could be read to denote that there is no requirement that three-bedroom units be included. But during the Commission's November 14, 2016, regular public meeting, Commission Vice-Chair Miller described, without objection, the applicant's "modifi[cation of] its proffer to provide more two *and* three-bedroom units at affordable levels"

(continued…)

furthers the goals and policies of the Benning Road Redevelopment Framework Plan (the "Benning Road Plan"), which "specifically calls the Property out as appropriate for redevelopment as a mixed-use residential and retail project."[8]

During the September 29, 2016, public hearing, petitioner Cole's comments were limited. She testified that she believed the applicant would "demolish [her] building," and she asked where current senior, disabled, and low-income residents would go if that happened. She recommended that the Property "remain as it is." She complained that traffic in the neighborhood was already "very heavy" and that there is "very limited parking" in the area. She also expressed concern about the 90-foot height of the proposed building, saying that the height is "a lot."

---

(…continued)

(emphasis added). Vice-Chair Miller also said that, in light of the public testimony on the PUD application, it was "important to note" the applicant's representation that "the only three-bedroom units in the project are affordable units."

[8] The Benning Road Plan, which was approved by a resolution of the Council of the District of Columbia in July 2008, was developed by OP working with a steering committee made up of representatives from the community as well as elected officials. *See* BENNING ROAD CORRIDOR REDEVELOPMENT FRAMEWORK MAIN PAGE, https://planning.dc.gov/publication/benning-road-corridor-redevelopment-framework-main-page (last visited April 29, 2019). Five community meetings were held to provide data and receive input from the broader community, and a Mayor's hearing was held on a draft of the plan; this draft was released for public review. *Id.*

In her brief to this court, petitioner no longer asserts that her building will be demolished (apparently satisfied by the assurance from the applicant's counsel, acknowledged by the Commission, that the PUD "will not displace any residential uses"). However, petitioner has expanded her objections to the PUD and now argues that the Commission's action was faulty in several respects. She asserts that the Commission "never proactively sought to identify," and "failed to actively identify," "a myriad of basic project impacts," and made "no effort to mitigate them to protect the surrounding community." Listing those potential impacts, petitioner complains that no "mitigation is in place to protect the existing neighbors . . . from land value destabilization and gentrification pressures that will be brought on by the . . . project," that the Commission "fail[ed] to contend with the issue of displacement and rising gentrification pressures brought on by this project," and that the Commission's decision contains "no acknowledgment of how the . . . proposal to build a project with 90% of the units selling as luxury apartments/condos . . . will impact . . . existing affordability levels." Petitioner asserts that there is "little affordability included in the . . . project."

Petitioner further complains that the Commission record contains no written reports from relevant agencies (other than the District of Columbia Department of

Transportation ("DDOT")).[9]  She contends that OP was required to have "written reporting from relevant agencies before taking [a] position[]" on the PUD application and that "[w]ithout relevant agency reports on the record, the Commission's decision to approve the [a]pplicant's PUD project is arbitrary and unlawful."  Petitioner asserts that she seeks a thorough and thoughtful review by the Commission in order to be protected from "overwhelming construction nuisances" such as noise, dust, and pollution; from the "overburdening . . . of . . . existing public services," including gas, water, electric, and bus service; and from "rising housing costs."[10]  She asserts that by failing to undertake that review, the

---

[9]  Specifically, petitioner points out that the record contains no written report from the Department of Housing and Community Development ("DHCD") confronting impacts such as displacement;  no written report from the Department of Energy and the Environment ("DOEE") showing how the location of the PUD's loading dock "will not bring additional noise, refuse, odors, emissions, and other environmental impacts";  no written reports from police and fire department officials about whether they have the capacity to handle the emergency needs for "another 200 units" without an adverse impact on emergency response times;  and no "studies from DC public schools, libraries, parks and works, or senior services [regarding whether] the additional new units as proposed . . . will also require additional public services to be created to meet the need."  Petitioner also complains that there is no reference in the DDOT report to the "pedestrian safety of a truck loading entrance [and "large trucks driving daily"] on the main boulevard where . . . children walk, play and ride their bikes."

[10]  Petitioner suggests that the Commission gave no consideration, for example, to whether there will be the capacity to accommodate "200 new toilets pumping into the city's old pipes where only a few flush now."

Commission "eliminate[d] fundamental due process granted by statutory zoning protections afforded to [petitioner and her] community."

## II.

"The overall goal of the [PUD] process is to permit flexibility in the zoning regulations, so long as the PUD 'offers a commendable number or quality of public benefits' and 'protects and advances the public health, safety, welfare, and convenience.'" *Barry Farm Tenants & Allies Ass'n v. District of Columbia Zoning Comm'n*, 182 A.3d 1214, 1219 (D.C. 2018) (quoting 11 DCMR § 2400.2 (2015). "In deciding a PUD application, the Commission shall judge, balance, and reconcile the relative value of the project amenities and public benefits offered, the degree of development incentives requested, and any potential adverse effects according to the specific circumstances of the case." 11 DCMR § 2403.8 (2015). The Commission was authorized to approve the PUD application if it found that any adverse "impact of the project on the surrounding area and the operation of city services and facilities" is "capable of being mitigated, or acceptable given the quality of public benefits in the project." 11 DCMR § 2403.3 (2015).

This court's review of the Commission's decision is deferential. *Durant v.*

*District of Columbia Zoning Comm'n*, 65 A.3d 1161, 1167 (D.C. 2013). It is not our role to determine "whether a particular zoning action is, or is not, desirable," *id.* (internal quotation marks omitted), or to "reassess the merits of the decision." *Washington Canoe Club v. District of Columbia Zoning Comm'n*, 889 A.2d 995, 998 (D.C. 2005). "Absent a material procedural impropriety or error of law, the Commission's decision stands so long as it 'rationally flows from findings of fact supported by substantial evidence in the record as a whole.'" *Spring Valley-Wesley Heights Citizens Ass'n v. District of Columbia Zoning Comm'n*, 856 A.2d 1174, 1176-77 (D.C. 2004) (quoting *Georgetown Residents Alliance v. District of Columbia Bd. of Zoning Adjustment*, 802 A.2d 359, 363 (D.C. 2002)). "[W]e may hold unlawful and set aside an agency action in a contested case only where it is found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, without observance of procedure required by law, or unsupported by substantial evidence in the record of the proceedings . . . ." *Union Mkt. Neighbors v. District of Columbia Zoning Comm'n* ("*UMN* I"), 197 A.3d 1063, 1067 (D.C. 2018) (internal quotation marks and brackets omitted). "[T]he agency's decision . . . is presumed to be correct, so that the burden of demonstrating error is on the . . . petitioner who challenges the decision." *Id.* at 1068 (internal quotation marks omitted). Although we "generally cannot uphold an agency decision on grounds other than those actually relied upon by the

agency[,]" *Newell-Brinkley v. Walton*, 84 A.3d 53, 59 (D.C. 2014) (internal quotation marks omitted), we "should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Kamit Inst. for Magnificent Achievers v. District of Columbia Pub. Charter Sch. Bd.*, 55 A.3d 894, 901 n.10 (D.C. 2012) (internal quotation marks omitted) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009)). We defer to the Zoning Commission's interpretation of its own regulations. *1330 Connecticut Avenue, Inc. v. District of Columbia Zoning Comm'n*, 669 A.2d 708, 714-15 (D.C. 1995).

## III.

## A.

Although petitioner did not raise before the Commission the issues she now raises relating to gentrification, land value destabilization, and displacement, the issues of "gentrification" in the community in which the proposed PUD is located and the associated "displacement of low-income residents" were raised by Equitable and Respectful Reinvestment in its submission to the Commission. Thus, the adequacy of the Commission's consideration of those issues is preserved

for our review.[11]  Upon that review, we are satisfied that the Commission gave adequate consideration to these issues.

The record does not support petitioner's complaint that the Commission did not acknowledge or act to mitigate the potential impact of the PUD on neighborhood land values, displacement, and housing affordability levels.  To begin with, the Commission specifically noted the applicant's "confirm[ation] . . . that no residential uses would be displaced by the Project."  Second, the Commission referred to the units to be set aside for households with incomes less than 50% or 80% of the area median income as IZ units "pursuant to 11 DCMR, Chapter 26," i.e., the Commission's own inclusionary zoning regulations (now codified at 11-C DCMR § 1000.1 *et seq.*)  The stated goals of the Commission's IZ regulations include to "further[] the Housing Element of the Comprehensive Plan

_____

[11]  *See York Apartments Tenants Ass'n v. District of Columbia Zoning Comm'n*, 856 A.2d 1079, 1085 n.6 (D.C. 2004) (agreeing with other courts that "so long as the appellant or some other party has put an objection on the record, the obligation to exhaust is discharged" and that "[i]t is not always necessary for a party to raise an issue, so long as the Commission in fact considered the issue"; stating that because "the issues raised by [the petitioner] in this court were raised before the agency, just not by [petitioner] itself," the petitioner is not "estopped from presenting its claims to this court") (internal quotation marks and brackets omitted).  We deem the issues of gentrification, land value destabilization, and displacement to be adequately preserved for our review even though, as the Commission correctly noted, Equitable and Respectful Reinvestment "opposed redevelopment of sites adjacent to the Property, but did not address redevelopment of the instant Property."

by increasing the amount and expanding the geographic distribution of adequate, affordable housing available to current and future residents," "[t]o mitigate the impact of market-rate residential development on the availability and cost of housing available and affordable to low- and moderate-income households," and "[t]o create a stock of housing that will be affordable to low- and moderate-income residents over a long term." 11 DCMR §§ 2600.1, 2600.3(c), (g) (2015). In short, mitigation of the potential displacement of low-income residents through gentrification and market pressures is taken into account in the Zoning Commission's IZ regulations. Thus, in directing that the applicant "shall," "[f]or the life of the project," as a condition of approval of the PUD, reserve not less than the indicated percentage of the residential gross floor area "as inclusionary units pursuant to [the Commission's IZ regulations]," the Commission *did* act to mitigate the impact of market-rate residential development on the availability of affordable housing in the area.[12]

Further, the Commission requested that the applicant "consider [a] deeper affordability proffer," the result of which was the applicant's modification of its

---

[12] While we appreciate that petitioner (and others) may believe that the set-aside is not sufficient, we have no authority to second-guess the Commission's judgment on such policy matters.

original proposal to reserve half of the building's affordable units for households earning up to 50% of the area median income (whereas the original application called for affordable housing for households earning up to 80% of the area median income) and "modifi[cation of] its proffer to provide more two and three-bedroom units at affordable levels" (now a requirement under the Commission's decision "[f]or the life of the Project"). On the day the Commission voted to take proposed action approving the PUD application, Commission Vice-Chair Miller observed that as a result of the modification the Commission requested, "the applicant is providing opportunity for low-income families [including, presumably, some existing residents of the neighborhood around the PUD] to live in the building and have access to the same amenities as the market rate units."

Petitioner is correct that the Commission's decision does not include an explicit discussion of "rising gentrification pressures." However, as we have explained previously, where issues were "thoroughly analyzed during the development of the . . . Plan" for the area of the District in which a PUD is proposed,[13] and where the Commission has been explicitly guided by an

---

[13] Such small-area plans "provide supplemental guidance to the Zoning Commission and other District agencies in carrying out the policies of the Comprehensive Plan." D.C. Code § 1-306.03(c)(4) (2016 Repl.).

application's compatibility with the applicable small-area Plan, we "cannot agree with [an] argument that the Commission failed adequately to consider the impact of th[e] project. " *Union Mkt. Neighbors v. District of Columbia Zoning Comm'n* ("*UMN* II"), 204 A.3d 1267, 1272 (D.C. 2019) (affirming a Commission PUD approval after noting, *inter alia*, that the applicable Small Area Plan had already "considered the challenge of rising housing costs and the destabilization of land values in the community" (internal quotation marks omitted)). As OP pointed out in its April 1, 2016, setdown report and as the PUD application notes, the Upper Northeast Area Element of the Comprehensive Plan declares a policy of development that will include "persons of low and very low income as well as those of moderate and higher incomes" and avoidance of "further concentration of poverty." The Commission's references to the proposed PUD's compatibility with the Upper Northeast Area Element development policy and with the Benning Road Plan enable us to discern the agency's path: a recognition that the pressures of gentrification are inevitable,[14] but can be mitigated through inclusionary zoning

---

[14] The Comprehensive Plan recognizes the reality of "gentrifying neighborhoods," 10-A DCMR §§ 509.2, 713.7 (2015), and calls for measures such as the District's "channel[ing] a greater share of the revenues being created by the strong housing market into new programs that preserve affordable units." 10-A DCMR § 509.1 (2015). The Comprehensive Plan also declares that "[c]hange in the District of Columbia is both inevitable and desirable." 10-A DCMR § 217.1 (2015).

and through the types of programs discussed in the Benning Road Plan,[15] rather than avoided by having underutilized property "remain as it is," as petitioner urged before the Commission.

In sum, because the Commission was explicitly guided by the PUD application's compatibility with the publicly developed plans for the area in which the PUD site is located, we cannot agree with petitioner that the Commission failed to acknowledge or grapple with issues of gentrification.  *Cf. UMN* II, 204 A.3d at 1272; *Miller v. Lehman*, 801 F.2d 492, 497 (D.C. Cir. 1986) (stating that "'if the necessary articulation of basis for administrative action can be discerned by reference to clearly relevant sources other than a formal statement of reasons, [the court] will make the reference'" (quoting *Environmental Def. Fund, Inc. v. EPA*, 465 F.2d 528, 537 (D.C. Cir. 1972)); *Auto. Parts & Accessories Ass'n v. Boyd*, 407 F.2d 330, 342 (D.C. Cir. 1968) (affirming the agency decision where the benefits that were the rationale for the agency's decision "were clearly identifiable from

---

[15]   The Benning Road Plan, describes, for example, the DHCD "First Right Purchase Program," which offers low-interest rate loans to income-qualified persons and tenant groups in the District, the proceeds of which can be used for down payments, earnest money deposits, and other expenses to enable low and moderate income residents who are threatened with displacement because of the sale of their buildings to exercise their first right to purchase the buildings. BENNING ROAD CORRIDOR REDEVELOPMENT FRAMEWORK PLAN APPENDIX, https://planning.dc.gov/sites/default/files/dc/sites/op/publication/attachments/reduced6_Part2.pdf (last visited April 29, 2019).

information and specific data contained in submissions from . . . independent sources").

**B.**

Neither petitioner nor anyone else raised before the Zoning Commission the next objection petitioner now raises: that the OP report did not include written assessments from relevant agencies other than OP itself and DDOT. Petitioner argues that OP was required to have "written reporting from relevant agencies before taking [a] position[] . . ." on the PUD application, and that in the absence of written reports from the relevant agencies, the Commission's decision to approve the PUD project was "arbitrary and unlawful." Petitioner relies on 11 DCMR § 2407.3, set out in the 1958 Zoning Regulations as amended, which states that:

> If a public hearing is granted, the Office of Planning shall coordinate review of the application and prepare an impact assessment of the project, which shall include reports in writing from relevant District departments and agencies, including, but not limited to, the Departments of Transportation and Housing and Community Development and, if a historic district or historic landmark is involved, the State Historic Preservation Officer.

11 DCMR § 2407.3 (2015). By contrast, Intervenor argues that the Commission "ha[d] no statutory or other legal obligation to obtain written reports from any

agency of the District." Intervenor also asserts more generally that petitioner has waived any issue that was not raised before the Commission. We agree that petitioner has waived the written-agency-reports issue (and do not reach the issue of whether such reports were required in the wake of the 2016 Zoning Regulations).

In announcing the public hearing in this case, the Commission explained that

> Because the case was set down for hearing prior to the September 6, 2016 effective date of the replacement version of Title 11 . . . [,] all of the substantive requirement[s] of the Zoning Regulations in effect as of September 5, 2016 . . . will continue to apply to this application and any construction authorized by the Commission. However, *because the hearing has been scheduled after the effective date, all applicable procedural requirements of the 1958 Regulations will apply to this application until September 5, 2016, after which the applicable procedural rules set forth in the 2016 Regulations will apply.*

63 D.C. Reg. 9371, 9371 (July 8, 2016) (emphasis added). Further, at the commencement of its public hearing in this matter, the Commission Chair told attendees that copies of the notice of public hearing containing the statement block-quoted above were available, and then went on to state explicitly that the Commission would conduct the hearing in accordance with "Subtitle Z, Chapter 4" — i.e., in accordance with the 2016 procedural regulations, including 11-Z DCMR

§ 405.3 (2016). Section 405.3 states that OP's report to the Commission "shall include *any written reports submitted* by" relevant public agencies (emphasis added). 11-Z DCMR § 405.3 (2016). Thus, § 405.3 does not contain a requirement that OP receive or solicit reports from other agencies before making its recommendation to the Commission or that the Commission have reports from other agencies before making its decision on a PUD application. No one in attendance at the public hearing, including petitioner Cole, objected when the Commission Chair announced that the Commission would proceed under the revised procedural rules. We therefore conclude that petitioner waived any objection to the Commission's proceeding to a decision without written reports from agencies other than OP and DDOT.

**C**.

This court said in *Friends of McMillan Park* that where the Comprehensive Plan specifically addresses certain topics, the Commission "must appropriately address those topics when deciding whether a PUD is consistent with the Comprehensive Plan and whether a PUD would have adverse effects." 149 A.3d at 1037. For that reason, although neither petitioner nor anyone else raised before the Commission some of the potential development impacts that petitioner asserts the

Commission failed to adequately consider, we consider them, because they are topics specifically addressed in the Comprehensive Plan.[16]

Petitioner asserts that the Commission gave inadequate consideration to pedestrian safety. The Commission found, however, that the PUD offers pedestrian safety benefits and that any traffic, parking, and other transportation impacts are "capable of being mitigated through the measures proposed by the [a]pplicant and are acceptable given the quality of the public benefits of the PUD." With regard to pedestrian safety, the Commission found that the proposed development will include only one curb cut along Benning Road instead of the current four, an improvement, consistent with the Benning Road Plan, that "will reduce the potential for conflicts between vehicular and pedestrian traffic." In addition, the proposed building must be set back four feet from the property line to enable the applicant to widen sidewalks to "ease pedestrian circulation." The

---

[16]   *See* 10-A DCMR §§ 404.8 (describing a policy of minimizing curb cuts in new developments because they "reduce pedestrian safety"); 2502.5 (stating that "[t]o the greatest extent feasible," the development review process should be used "to ensure that impacts on . . . traffic, parking and environmental quality are assessed and adequately mitigated"); 2502.7 ("Ensure that development does not exceed the capacity of infrastructure. Land use decisions should balance the need to accommodate growth and development with available transportation capacity, including transit and other travel modes as well as streets and highways, and the availability of water, sewer, drainage, solid waste, and other public services."); and 311.5 ("Ensure that new commercial development adjacent to lower density residential areas provides effective physical buffers to avoid adverse effects.").

applicant is also obligated to construct a sidewalk on H Street where none currently exists. Further, for the life of the project, the PUD will be subject to a loading management plan under which trucks using the loading dock must perform "[a]ll reverse maneuvers" within the loading area and "not across public space." The building's parking garage will be accessed through the alley (and the Commission credited DDOT's testimony that the alley will be able to "accommodate the proposed traffic despite resident concerns to the contrary"). These are just some of the measures the applicant proposed and the Commission required to mitigate potential adverse impacts on pedestrians.

To mitigate adverse parking and traffic impacts from the PUD, the Commission's decision requires the applicant, for the life of the Project, to abide by the terms of a transportation demand management ("TDM") plan. Under the TDM plan, the applicant must supply bicycle parking spaces and a repair station and, consistent with the limitations and time periods described in the Commission's decision, supply bicycle helmets and Metro SmarTrip cards to residents. In addition, the applicant must include a provision in leases precluding residents from securing a residential parking permit (and although DDOT's report questioned whether this restriction is enforceable, DDOT found that "[o]n-street vehicle parking supply is available to meet the project's parking demand").

Further, the Commission credited the applicant's analysis indicating that the proposed development will "not significantly increase travel delay in the area" and the testimony of the applicant's traffic consultant that the PUD "would not have adverse effects due to traffic or parking impacts."

Petitioner complains that the Commission did not adequately consider that existing residents need protection from construction and loading-dock nuisances such as noise, refuse, odors, emissions, and other environmental impacts. Under the Commission's decision, however, the applicant will be required to abide by the terms of a construction management plan under which construction-work hours and days will be limited, and, for the life of the project, the applicant will be required to adhere to a loading management plan, under which, for example, "[t]rucks will not be allowed to idle." Additionally, under the construction management plan, "[a]ll loose fill such as gravel or sand shall be covered in accordance with industry standards," and "[a]ny temporary lighting shall be directed away from residences in the neighborhood." Regarding potential nuisances from the loading dock, the Commission found that the loading spaces will be tucked into an internal courtyard, "buffering [them] from adjacent homes"; the Comprehensive Plan lists such "setbacks" as a means of buffering to avoid adverse effects. 10-A DCMR § 311.5 (2015). Regarding environmental concerns,

the Commission's decision requires the applicant to submit evidence that the project will be "eligible for certification at the LEED v. 2009 Gold level."

Petitioner further complains that the Commission inadequately considered the "overburdening . . . of . . . existing public services" and utilities. But the Comprehensive Plan states that "infrastructure is generally in place to support additional development" in the District and that "[t]he central challenge faced by the District is not one of capacity but one of meeting maintenance and replacement needs." 10-A DCMR § 1300.2 (2015). Further, the Upper Northeast Area Element of the Comprehensive Plan encourages "residential infill development throughout Upper Northeast neighborhoods," 10-A DCMR § 2408.3 (2015), and, as OP referenced in its final report, the Benning Road Plan describes the "re-densification potential [of the area of the PUD site] to accommodate more residential and as a result, increase the commercial/retail support base in the area." The Commission credited the testimony (from OP, DDOT, and/or the Intervenor) that the site of the PUD is "appropriate for Medium Density Residential and Medium Density Commercial development," that the proposed density of the PUD

is consistent with such development, and that "the impact of the PUD on the level of services will not be unacceptable."[17]

With regard to petitioner's complaint about the height of the proposed building, we note that the Comprehensive Plan specifically contemplates that "height step downs," 10-A DCMR § 311.5 (2015), can be used to mitigate adverse effects of building height. The Commission found that the proposed building "steps down to lesser heights" as it stretches from its planned 90-foot height at the western end toward neighboring low-rise apartments at its eastern end. The Commission noted and gave great weight to ANC 6A's comment that this design element will "ensure[] that the light and air of neighboring properties will not be negatively impacted." The Commission concluded that the proposed building height is appropriate because it is consistent with the planned redevelopment designated in the Benning Road Plan and the expected similar massing of additional developments being planned for the neighborhood.[18]

_____

[17] We also note that the Intervenor's brief asserts, without contradiction from petitioner, that its engineering consultant "found that the potable water and sewer services in the area have capacity to service the Project."

[18] The Commission also considered other concerns that petitioner expressed. For example, petitioner expressed concern that she and her neighbors not lose their sense of community. The Commission cited, as a public benefit of

(continued…)

Finally, we cannot agree with petitioner's assertion that the Commission "[d]ismiss[ed] [d]ue [p]rocess." The record shows that petitioner was "'afford[ed] . . . an opportunity to present [her] objections'"[19] during the public hearing, and was permitted to make the points she wished to make without interruption.

We are satisfied that the mitigation measures the Commission required were sufficient for it to conclude that the impacts of the PUD on affordability of housing, pedestrian safety, parking and traffic, the environment, the adequacy of

---

(…continued)
the project, the fact that a space within the project will be designated for use by the community for public meetings.

Petitioner complains that the first floor of the PUD will include "commercial/retail uses the details and extent of which remains only known to the Applicant-Intervenor." However, the Commission is required to make findings only on material contested issues. *See Wheeler v. District of Columbia Bd. of Zoning Adjustment*, 395 A.2d 85, 88 (D.C. 1978); *see also Lee v. District of Columbia Zoning Comm'n*, 411 A.2d 635, 638-39 (D.C. 1980). The identity of anticipated retail tenants was not a material contested issue in this proceeding and is not a part of what the Commission is required to consider in reviewing a PUD application (though it perhaps is a proper subject for the Department of Consumer and Regulatory Affairs when a building permit or certificate of occupancy is sought).

[19] *Quincy Park Condo. Unit Owners' Ass'n v. District of Columbia Bd. of Zoning Adjustment*, 4 A.3d 1283, 1289 (D.C. 2010) (quoting *Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950)).

public services, and access to light and air will not be unacceptable given the quality of the public benefits the PUD will provide. Given our deferential standard of review, we cannot agree with petitioner that the Commission failed adequately to consider the impact of the project on the neighborhood or otherwise to do its job. "Contrary to [petitioner's] assertions, the order of the Commission is replete with evidence that the Commission took into account the neighborhood impact of what it recognized as a major 'redevelopment of an underutilized parcel.'"[20]

In sum, we see no basis to disturb the Commission's decision. Wherefore, the decision of the Zoning Commission is

*Affirmed.*

---

[20] *UMN* I, 197 A.3d at 1069.