*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

Nos. 17-AA-554, 17-AA-555, and 17-AA-556

RYAN CUMMINS, et al., PETITIONERS,

v.

DISTRICT OF COLUMBIA ZONING COMMISSION, RESPONDENT,

and

PARK VIEW COMMUNITY PARTNERS LLC, INTERVENOR.

Petitions for Review of an Order of the
District of Columbia Zoning Commission
(ZC-16-11)

(Argued February 14, 2019                          Decided June 25, 2020)

*Ryan Cummins*, pro se petitioner.

*Marc Anthony Poe*, pro se petitioner.

*Nida Chaudhary*, pro se petitioner.

*Richard S. Love*, Senior Assistant Attorney General, with whom *Karl A. Racine*, Attorney General for the District of Columbia, *Loren L. AliKhan*, Solicitor General, and *Stacy L. Anderson*, Acting Deputy Solicitor General, were on the brief, for respondent.

*Paul J. Kiernan*, with whom *Kyrus L. Freeman* and *Philip T. Evans* were on the brief, for intervenor.

*Henry J. Brothers II* for D.C. Appleseed Center for Law and Justice, amicus curiae, in support of affirmance. *Matthew S. Yeo* and *Marcus A. Gadson* were on the brief for amicus curiae.

Before THOMPSON, EASTERLY, and MCLEESE, *Associate Judges*.

Opinion for the court by *Associate Judge* MCLEESE.

Concurrence and dissent by *Associate Judge* THOMPSON at page 34.

MCLEESE, *Associate Judge*: In the order under review, the Zoning Commission approved a Planned Unit Development (PUD) to be located just west of Georgia Avenue, between Columbia Road and Irving Street, NW. Petitioners, who live in the immediate area of the proposed development, challenge the Commission's decision. We vacate and remand the case for further proceedings.

## I.

The PUD application in this case was submitted in May 2016 by intervenor Park View Community Partners LLC and the District of Columbia government. The zoning regulations were amended effective September 2016. 11-A DCMR § 100.3 (2016); *see Cole v. District of Columbia Zoning Comm'n*, 210 A.3d 753, 758 n.6 (D.C. 2019). In the present case, the Commission applied the old regulations in considering the application, except that the hearing was conducted pursuant to the procedural requirements of the new regulations. With one exception, which we

discuss *infra*, the parties acquiesce in that approach. We do the same, although in some places we cite both old and new regulations.

## A.

The PUD process allows the Commission to grant exceptions to otherwise applicable zoning regulations if the PUD "offers a commendable number or quality of public benefits" and "protects and advances the public health, safety, welfare, and convenience." 11 DCMR § 2400.2 (2016); *see also* 11-X DCMR § 300.1 (2020). In deciding whether to approve a PUD, the Commission must weigh "the relative value of the project amenities and public benefits offered, the degree of development incentives requested, and any potential adverse effects." 11 DCMR § 2403.8 (2016); *see also* 11-X DCMR § 304.3 (2020).

The Commission may not approve a PUD that is inconsistent with the Comprehensive Plan. 11 DCMR § 2400.4 (2016); 11-X DCMR §§ 300.2, 304.4 (2020). The Comprehensive Plan is a legislative enactment establishing a "broad framework intended to guide the future land use planning decisions for the District." *Wisconsin-Newark Neighborhood Coal. v. District of Columbia Zoning Comm'n*, 33 A.3d 382, 394 (D.C. 2011) (internal quotation marks omitted); *see D.C. Library*

*Renaissance Project/W. End Library Advisory Grp. v. District of Columbia Zoning Comm'n*, 73 A.3d 107, 112 n.2 (D.C. 2013) (Comprehensive Plan was enacted by Council of District of Columbia). "The Comprehensive Plan reflects numerous occasionally competing policies and goals, and, except where specifically provided, the Plan is not binding." *Friends of McMillan Park v. District of Columbia Zoning Comm'n (FOMP I)*, 149 A.3d 1027, 1034 (D.C. 2016) (brackets and internal quotation marks omitted). If a PUD implicates conflicting mandatory provisions of the Comprehensive Plan, the Commission may approve the PUD "only if the Commission (1) concludes that disregarding one such provision is necessary to comply with one or more other such provisions and (2) explains why it is deciding to favor one such provision over the other such provision." *Barry Farm Tenants & Allies Ass'n v. District of Columbia Zoning Comm'n*, 182 A.3d 1214, 1223 (D.C. 2018).

With respect to non-mandatory provisions of the Comprehensive Plan, "the Commission may balance competing priorities in determining whether a PUD is consistent with the Comprehensive Plan as a whole." *FOMP I*, 149 A.3d at 1034 (internal quotation marks omitted). Nevertheless, "the Comprehensive Plan's provisions have substantial force even if they are not mandatory. . . . The Commission cannot simply disregard some provisions of the Comprehensive Plan

on the ground that a PUD is consistent with or supported by other provisions of the Comprehensive Plan." *Id.* at 1035. Rather, the Commission may approve a PUD that is inconsistent with one or more non-mandatory policies in the Comprehensive Plan only if it "recognizes these conflicting policies and explains why they are outweighed by other, competing considerations." *Friends of McMillan Park v. District of Columbia Zoning Comm'n (FOMP III)*, 211 A.3d 139, 146 (D.C. 2019) (brackets and internal quotation marks omitted).

The Comprehensive Plan includes the Land Use Element, which "establishes the basic policies guiding the physical form of the city, and provides direction on a range of development, conservation, and land use compatibility issues." 10-A DCMR § 300.1 (2020). The Future Land Use Map (FLUM) visually represents the land-use policies reflected in the Land Use Element. 10-A DCMR § 225.1 (2020). The FLUM generally designates residential and commercial areas as being low-density, moderate-density, medium-density, or high-density. 10-A DCMR § 225.2 to .11 (2020). Finally, the Generalized Policy Map visually represents how land use may change between 2005 and 2025 and is used "to guide land use decision-making" in conjunction with the Comprehensive Plan and the FLUM. 10-A DCMR § 223.1, 223.2 (2020).

By regulation, the Zoning Commission should, "[t]o the greatest extent feasible, use the development review process to ensure that impacts on neighborhood stability, traffic, parking[,] and environmental quality are assessed and adequately mitigated." 10-A DCMR § 2502.5 (2020). *See also* 11 DCMR § 2400.3 (2016) ("A comprehensive public review by the Zoning Commission of the specific [PUD] proposal is required in order to evaluate the public benefits offered in proportion to the flexibility or incentives requested . . . ."); 11-X DCMR § 300.5 (2020).

Under the provisions in effect at the time the PUD application in this case was filed, once an application is received, the Office of Planning (OP) would prepare a preliminary report for the Commission, which then would determine whether a hearing was necessary. 11 DCMR § 2407.1, .2 (2016). A PUD application could not be granted unless a public hearing was held. 11 DCMR § 2407.2 (2016). Before the public hearing, OP was required to "coordinate review of the application and prepare an impact assessment of the project, which shall include reports in writing from relevant District departments and agencies, including, but not limited to, the Departments of Transportation and Housing and Community Development." 11 DCMR § 2407.3 (2016); s*ee also* 11 DCMR §§ 2408.4, 3012.1, 3012.2 (2016). The written reports, including OP's assessment, were to be made part of the public record and filed at least ten days before the public hearing. 11 DCMR § 3012.3 (2016).

The Commission must give "great weight" to OP's recommendation. D.C. Code § 6-623.04 (2018 Repl.).

The new regulations governing PUD applications contain several provisions regarding written reports by relevant agencies that are identical to the provisions in the old regulations. 11-X DCMR § 308.2 (2020) (PUD application cannot be granted unless public hearing is held); 11-X DCMR § 308.4 (2020) (if public hearing is held regarding PUD application, OP "shall coordinate review of the application and prepare an impact assessment of the project, which shall include reports in writing from relevant District of Columbia departments and agencies, including, but not limited to, the Departments of Transportation and Housing and Community Development"). The new regulations differ in certain respects, however. For example, the general provisions about written reports (as opposed to the provisions specifically applicable to PUD applications) focus on the procedures in connection with OP's preparation of a preliminary report. 11-Z DCMR § 405 (2020). In that context, the regulations do not appear to require OP to request written reports from other public agencies and do not require public agencies to prepare such reports. 11-Z DCMR § 405.1, 405.3, 405.4 (2020); *see generally Cole*, 210 A.3d at 764 (discussing 11-Z DCMR § 405.3).

**B.**

Except as noted, the following appears to be undisputed. The PUD site used to be the location of Bruce Monroe Elementary School, which was closed in 2008 and demolished in 2009. Eventually, the site came to be used as a community park. The site currently contains recreational facilities and a community garden.

The eastern side of the site runs along Georgia Avenue. To the immediate north and south along Georgia Avenue are commercial and residential buildings, mostly four stories or lower. Some approved but not yet constructed buildings in the vicinity of the site would be up to ninety feet high. The western side of the site is surrounded to the north, west, and south primarily by two-story row houses.

The PUD would replace approximately half of the community park with an apartment building, a building for senior residents, and eight townhomes, with the rest of the site remaining for park and recreational uses. The proposed apartment building would be nine stories tall (or eight stories tall with a mezzanine) and would be ninety feet high (plus a penthouse). The senior building would be six stories tall and sixty feet high.

The proposed development would create a total of 273 new residential units, a substantial number of which would be public-housing units or "workforce affordable" units. The new public-housing units would serve to replace units scheduled to be demolished at the Park Morton public-housing complex a few blocks away. The plan is for residents at Park Morton to relocate to new units at Bruce Monroe while renovations take place at Park Morton, thus minimizing displacement of Park Morton residents.

Before the order at issue, the western portion of the PUD site was zoned R-4 (with the "R" standing for residential). As a matter of right, buildings in that zone can be forty feet high and can be up to three stories tall. 11 DCMR § 400.1 (2016). The eastern portion of the site, which runs along Georgia Avenue, was zoned C-2-A (with the "C" standing for commercial). As a matter of right, buildings in that zone can be fifty feet high. 11 DCMR § 770.1 (2016). On the Generalized Policy Map, the western portion of the site is designated as a Neighborhood Conservation Area. The Comprehensive Plan states that

> [t]he guiding philosophy in Neighborhood Conservation Areas is to conserve and enhance established neighborhoods. Limited development and redevelopment opportunities do exist within these areas but they are small in scale. . . . [N]ew development and alterations should be compatible with the existing scale and architectural character of each area. Densities in Neighborhood

> Conservation Areas are guided by the Future Land Use
> Map.

10-A DCMR § 223.5 (2020). A substantial portion of the proposed ninety-foot-high apartment building would extend into the Neighborhood Conservation Area.

On the FLUM, most of the site is designated as a Local Public Facility, presumably because of the site's prior use as a school. 10-A DCMR § 225.15 (2020). One portion of the site, on which the new townhouses would be located, is designated as moderate-density residential. That "designation is used to define the District's row house neighborhoods, as well as its low-rise garden apartment complexes. The designation also applies to areas characterized by a mix of single family homes, 2-4 unit buildings, row houses, and low-rise apartment buildings." 10-A DCMR § 225.4 (2020).

On the western side of the site, the areas adjacent to the site are designated on the FLUM as moderate-density residential. On the eastern side of the site, the areas adjacent to the north and south are designated as various types of mixed commercial and residential use.

The PUD calls for the rezoning of the western portion of the site to R-5-B. As part of a PUD, a building in that residential zone can be sixty feet high, plus a fifteen-

foot-high penthouse. 11 DCMR § 2405.1 (2016). The eastern portion of the site would be rezoned C-2-B. As part of a PUD, a building in that commercial zone can be ninety feet high, plus a twenty-foot-high-penthouse. *Id.*

In November 2016, OP issued a report recommending approval of the application. OP solicited comments from many District agencies, but OP's hearing report stated that it had received no comments from District agencies, although the District's Department of Transportation was expected to provide comments separately. The Department of Transportation did separately submit a thirteen-page written report in advance of the hearing.

Before and at the public hearing in December 2016, interested individuals and groups submitted letters and testimony in support of or in opposition to the application. One of the groups in opposition was Bruce Monroe Park Neighbors, a group of owner-residents living within 200 feet of the PUD site. The Park Neighbors argued that the applications should be denied because, among other things, the proposed buildings would be much larger in scale and higher in density than other buildings in the immediate area. The Park Neighbors also expressed concerns that they would experience related adverse effects such as blocked air and light, reduced on-street parking, increased vehicular and pedestrian traffic, increased noise and air

pollution, and a reduction in available green public space. The Georgia Avenue Corridor Neighbors, a group that appears to include petitioner Cummins, also opposed the application and expressed concerns that OP had failed to provide a comprehensive review of the PUD's potential adverse impacts, specifically citing the lack of reports and other input from relevant agencies such as District of Columbia Water and Sewer Authority (DC Water), District of Columbia Department of Housing and Community Development (DHCD), and the Fire and Emergency Medical Services Department (FEMS). The Park Morton Resident Council supported the application and argued that if the application were not approved, the residents at Park Morton would be forced to continue to reside in poor conditions at Park Morton or possibly be displaced. The affected Advisory Neighborhood Commissions also supported the PUD.

A public hearing was held over two days on December 5 and 8, 2016. On December 8, the District of Columbia Department of Energy and Environment, DC Water, FEMS, and DHCD submitted brief statements or emails expressing views about the application. Those materials were submitted to OP, directly to the Commission, or to an attorney representing the intervenor.

After the hearing, intervenor and Bruce Monroe Park Neighbors each filed proposed findings of fact and conclusions of law. In March 2017, the Commission issued an order approving the application. It is undisputed that Commission's order was an over ninety-percent verbatim copy of intervenor's proposed findings of fact and conclusions of law.

The Commission identified numerous benefits of the PUD, including: provision of substantial affordable housing, use of high-quality architecture and urban design, use of sustainable design features, provision of employment and training opportunities, and provision of improved pedestrian and transportation circulation. The Commission also concluded that (1) the PUD was consistent with the Generalized Policy Map; (2) rezoning the western portion of the site R-5-B was appropriate in a Neighborhood Conservation Area; (3) the PUD was consistent with the designation of the site on the FLUM as a Local Public Facility; (4) the PUD was consistent with FLUM designations of areas adjacent to the site; (5) the building heights and density proposed in the PUD were appropriate for the site and the surrounding area; (6) the ninety-foot-high building was appropriate in an area designated for moderate-density commercial buildings; (7) the sixty-foot-high senior building was appropriate in an area designated for moderate density residential buildings; (8) the PUD's proposed density was necessary to implement

the plan of rebuilding Park Morton without displacement; (9) the PUD was consistent with the goal of preserving open space, even though the PUD would reduce the amount of open space on the site by approximately half, because the PUD would ensure that the current use would be preserved in the future and because the goal of preserving open space was outweighed by the PUD's other benefits; (10) the PUD was consistent with the general purposes, major elements, and specific policies of the Comprehensive Plan; (11) the PUD was consistent with plans for the revitalization of Georgia Avenue in the area of the site as well as the District's New Communities Initiative; (12) the PUD was consistent with the plan for the redevelopment of public housing at the Park Morton site; (13) the PUD would not have an adverse impact on air and water quality, noise, light and privacy, traffic, parking, public services, or property values; (14) even if the density and building heights of the PUD were not consistent with one or more specific policies in the Comprehensive Plan, the PUD advanced many other Plan policies and goals and thus as a whole would be consistent with the Comprehensive Plan; and (15) the PUD's density and building heights were necessary to advance those goals.

The Commission did not explicitly identify a single respect in which the PUD as approved would have an adverse effect or would be inconsistent with a policy in the Comprehensive Plan.

15

## II.

### A.

Generally, "[w]hen reviewing an order of the Commission . . . [w]e do not reassess the merits of the decision, but instead determine whether the [Commission's] findings and conclusions were arbitrary, capricious[,] or an abuse of discretion." *Washington Canoe Club v. District of Columbia Zoning Comm'n*, 889 A.2d 995, 998 (D.C. 2005) (internal quotation marks omitted). Petitioners argue that such deference is unwarranted in this case, because the Commission's order was an almost entirely verbatim copy of the intervenor's proposed findings of fact and conclusions of law. As previously noted, it is not disputed that the Commission's order was an over ninety percent verbatim copy of intervenor's filing. Rather, intervenor and the Commission argue that the Commission's order nevertheless is entitled to deference, because the Commission's revisions to the order demonstrate that the Commission exercised independent judgment. *See, e.g.*, *St. Mary's Episcopal Church v. District of Columbia Zoning Comm'n*, 174 A.3d 260, 268 (D.C. 2017) (applying ordinary deference, even though majority of paragraphs in Commission's order were adopted verbatim, where revisions indicated that Commission's order represented Commission's own considered conclusions).

Although this court has not prohibited the practice of verbatim adoption of orders proposed by one of the parties, we have repeatedly expressed reservations about the practice. *E.g.*, *Durant v. District of Columbia Zoning Comm'n (Durant II)*, 99 A.3d 253, 257-59 (D.C. 2014). In *Durant II*, which was decided more than two years before the Commission's order in the present case, we noted our "serious concern" about an almost entirely verbatim Zoning Commission order approving a PUD application. *Id.* at 258. We also explained that such verbatim adoption can trigger more careful judicial scrutiny and result in less deference to the ruling of the trial court or administrative agency. *Id.* at 257-58.

As we did in *Durant II*, we find in this case serious ground for concern that the Commission's order does not reflect careful and independent consideration by the Commission of the findings and conclusions that the intervenor submitted. The document submitted by intervenor was far from a neutral or even-handed analysis of the issues before the Commission. To be clear, we do not fault intervenor on that score. The document was prepared by intervenor's attorneys, who had a duty to zealously represent their client's interests. D.C. R. Prof. Conduct 1.3(a). The Commission's almost complete adoption of that document, however, gives us pause in a number of respects. We illustrate with four examples.

**1.**

As previously noted, the Commission's order did not contain a single explicit acknowledgment that the PUD would have any adverse effect whatsoever, or would be in any way or to any degree contrary to any policy or goal of the Comprehensive Plan. That is difficult to understand, because we think it indisputable that the PUD would have at least some adverse effects and would in some respects run up against some of the many often conflicting policies and goals reflected in the Comprehensive Plan. For example, placing a ninety-foot-high building across the street from two-story row houses seems clearly in tension with the policy reflected in 10-A DCMR § 309.10 (2020) ("Carefully manage the development of vacant land and the alteration of existing structures in and adjacent to single family neighborhoods in order to protect low density character, preserve open space, and maintain neighborhood scale."). The absence of any explicit acknowledgment by the Commission of any adverse effect or any tension with conflicting Comprehensive Plan policies becomes much more understandable, however, given that the Commission almost entirely adopted intervenor's submission, which naturally does not evenhandedly acknowledge such unfavorable considerations. *See, e.g.*, *Durant II*, 99 A.3d at 258 ("Advocates are prone to excesses of rhetoric and lengthy recitals of evidence favorable to their side but which ignore proper

evidence or inferences from evidence favorable to the other party. Trial judges are well advised to approach a party's proposed order with the sharp eye of a skeptic and the sharp pencil of an editor.") (internal quotation marks omitted).

The concurring/dissenting opinion states that the Commission's order can be understood as implicitly acknowledging that the PUD would have some adverse effects. *Infra* at 38-40. We think that is far from clear. In any event, it is a matter of concern that the Commission adopted essentially wholesale a proposed order that was drafted by the PUD applicant and that is at best implicit as to whether the PUD would have any adverse effects whatsoever.

**2.**

As previously noted, the ninety-foot-high apartment building would protrude substantially into a Neighborhood Conservation Area. That raises a significant issue, because the Generalized Policy Map states that new development in Neighborhood Conservation Areas "should be compatible with the existing scale and architectural character of each area." 10-A DCMR § 223.5 (2020). The Commission did not acknowledge that a substantial part of the ninety-foot-high building would be in a Neighborhood Conservation Area, nor did the Commission

analyze the consequences of that fact. To the contrary, the Commission's order was written as though only the new row houses and the sixty-foot-high senior building would be in a Neighborhood Conservation Area. That omission becomes more understandable given that the Commission adopted verbatim the pertinent part of intervenor's submission, which reflected the same omission.

The concurring/dissenting opinion acknowledges that the Commission made no mention of the ninety-foot building's protrusion into a Neighborhood Conservation Area. *Infra* at 42. The concurring/dissenting opinion contends, however, that we can infer the Commission's reasoning on this point: "Neighborhood Conservation Area boundaries do not strictly govern the PUD site given [the site's] status on the FLUM as a Local Public Facility site." *Id.* at 43. As a threshold matter, the Commission did not rely (explicitly or implicitly) on such a theory, instead concluding that the PUD was consistent with the Neighborhood Conservation Area designation. We therefore could not affirm on the theory suggested in the concurring/dissenting opinion. *See, e.g.*, *Apartment & Office Bldg. Ass'n v. Pub. Serv. Comm'n*, 129 A.3d 925, 930 (D.C. 2016) ("Generally, an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.") (internal quotation marks omitted). In any event, it would not be correct that the

FLUM designation automatically trumps the Neighborhood Conservation Area designation. The provision cited by the concurring/dissenting opinion (10-A DCMR § 223.2 (2020)) states that the two designations should be "interpreted in concert," not that either trumps the other. The Commission at a minimum was required to explicitly address the implications of the protrusion of the ninety-foot building into a Neighborhood Conservation Area. *Cf. Durant v. District of Columbia Zoning Comm'n (Durant I)*, 65 A.3d 1161, 1171-72 (D.C. 2013) (remanding for further consideration of question whether the PUD was consistent with Neighborhood Conservation Area designation); *cf. also* 11 DCMR § 2403.4 (2016) (Commission may not approve PUD that is inconsistent with any "other adopted public policies and active programs related to the subject site"); 11-X DCMR § 304.4(a) (2020) (same).

**3.**

In assessing whether the density and height of the buildings in the PUD are consistent with the Comprehensive Plan, the zoning in adjacent areas, and the character of the adjacent neighborhood, the Commission repeatedly stated that the areas adjacent to the western portion of the site are designated on the FLUM as medium-density residential. It appears to be undisputed, however, that this was an

error, and that in fact those areas are designated as moderate-density residential. That is an important error, because the two designations are significantly different. *Compare, e.g.*, 10-A DCMR § 225.4 (2020) (moderate-density-residential designation "is used to define the District's row house neighborhoods, as well as its low-rise garden apartment complexes. The designation also applies to areas characterized by a mix of single family homes, 2-4 unit buildings, row houses, and low-rise apartment buildings."), *with, e.g.*, 10-A DCMR § 225.5 (2020) (medium-density-residential designation "is used to define neighborhoods or areas where mid-rise (4-7 stor[y]) apartment buildings are the predominant use"). Moreover, the Commission relied heavily on this mistaken premise in explaining its conclusion that the PUD was consistent with both the FLUM and the character of the surrounding areas. This error too finds its source in intervenor's submission, the pertinent part of which the Commission adopted verbatim.

The concurring/dissenting opinion takes that position that, despite the inaccuracies in the Commission's order, the Commission actually understood that the areas adjacent to the western part of the PUD site were designated on the FLUM as moderate-density residential. *Infra* at 36-37. In support of that position, the concurring/dissenting opinion relies on (a) what the evidence and submissions before the Commission actually showed; (b) the unclear comment of a single

Commissioner at a hearing over seven months before the final order; and (c) and a single comment in the order that does not refer to the FLUM or to the categories of moderate and medium density, instead simply referring to the existing neighborhood to the north and west (not the entire area to the northwest, west, and southwest of the site) as "lower-scale." *Id.* These materials are weak support at best, but in any event they fail in light of the way in which the Commission's order is actually written. The inaccurate references to medium-density residential areas cannot reasonably be explained away as fleeting typographical errors not reflecting the Commission's actual understanding, because those references are an essential predicate for a detailed discussion of the Commission's reasons for concluding that the PUD is consistent with the FLUM designation of the surrounding area. Specifically, the Commission bases its conclusion on the building heights applicable in medium-density residential areas, rather than the significantly different building heights applicable to moderate-density residential areas. In sum, the Commission's order explicitly and unambiguously rests on the incorrect premise that the adjacent areas were designated medium-density residential.

**4.**

Finally, the Commission's order found that the senior building "mimics many other apartment houses that have been built as infill developments in the area." Petitioners contend that this finding is unsupported by the record, and neither the Commission nor intervenor has pointed us to support in the record for the finding. Here too intervenor's submission was the source of the Commission's apparently undisputed error.

Although it acknowledges that the words "mimic" and "many" may be imprecise, the concurring/dissenting opinion defends as essentially accurate the Commission's statement that the senior building "mimics many other apartment houses that have been built as infill developments in the area." *Infra* at 44. The two buildings cited by the concurring/dissenting opinion, however, are actually on Georgia Avenue, not like the senior building, which is on the western portion of the PUD site, adjacent to a moderate-density residential area. Moreover, the concurring/dissenting overlooks the word "infill." No one has pointed to any evidence that these two buildings, or any of the other approved buildings, were "infill developments." As the Commission acknowledged, specific provisions apply to infill development, indicating that such development should be "compatible in scale

with its surroundings."  10-A DCMR § 307.2 (2020); *see also* 10-A DCMR § 307.3

("[I]nfill development must be sensitive to neighborhood context. . . . [D]ensity and

scale should reflect the desired character of the surrounding area.").  In sum, the

Commission's statement about comparable infill development appears to be

unsupported by the record, and that inaccuracy is relevant to whether the PUD

should or should not have been approved.

**5.**

Although we have explained our concerns about the Commission's almost

entirely verbatim adoption of intervenor's submission, we need not decide whether

those concerns should lead us to accord reduced deference to the Commission's

order.  Rather, the errors and omissions we have just discussed, and one more to

which we turn next, lead us to conclude that Commission's order must be set aside

under ordinary principles of deference.

**B.**

As previously noted, the Commission concluded that the ninety-foot-high

building was consistent with a FLUM designation of moderate-density commercial

and the sixty-foot-high senior building was consistent with a FLUM designation of moderate-density residential. We conclude that the Commission's analysis of this issue is unreasonable.

We use the ninety-foot-high building to illustrate, because the Commission's analysis as to both buildings was essentially the same. The FLUM states that buildings in areas designated as moderate-density commercial "generally do not exceed five stories in height." 10-A DCMR § 225.9 (2020). That would seem hard to reconcile with a proposed ninety-foot building consisting of nine stories (or eight stories and a mezzanine). The Commission pointed out, however, that the zoning districts that correspond to moderate-density commercial are "generally C-2-A, C-2-B, and C-3-A." *Id.* The Commission further pointed out that a building as high as ninety feet is permissible for a PUD in a C-2-B zone. 11 DCMR § 2405.1 (2016). Assuming that the average story would be ten feet high, the Commission concluded that the FLUM is internally inconsistent, on one hand generally limiting buildings to no more than five stories but on the other hand authorizing buildings of up to ninety feet (and thus nine stories). The Commission appears to have resolved that perceived inconsistency by concluding that buildings of up to nine stories are generally permissible in areas designated in the FLUM as moderate-density commercial.

We conclude that the Commission's analysis (which we note was adopted verbatim from intervenor's submission) is foreclosed by prior decisions of this court. For example, in *Durant v. District of Columbia Zoning Comm'n (Durant III)*, 139 A.3d 880 (D.C. 2016), the Commission had reasoned that a six-story building could properly be characterized as moderate-density, rather than medium-density. 139 A.3d at 883-84. The Commission reached that conclusion even though, as previously noted, the FLUM states that moderate-density residential areas are generally "characterized by a mix of single family homes, 2-4 unit buildings, row houses, and low-rise apartment buildings," 10-A DCMR § 225.4 (2020), and medium-density residential areas are "neighborhoods or areas where mid-rise (4-7 stor[y]) apartment buildings are the predominant use," 10-A DCMR § 225.5 (2020). Pointing out that the FLUM's definition of moderate density also stated that the R-5-B zoning district "may also apply," the Commission essentially reasoned that any building that could be placed in the R-5-B zoning district was generally consistent with the moderate-density-residential designation. *Durant III*, 139 A.3d at 884. We deemed that approach unreasonable, explaining:

> [A]lthough buildings permissible in an R-5-B district may exist in moderate-density residential neighborhoods, 10-A DCMR § 225.4, that does not mean that such buildings are themselves necessarily understood to be moderate-density in character. To the contrary, moderate-density residential neighborhoods may contain some buildings that, considered in isolation, would not be moderate-density uses, such as existing multi-story apartments, many built

> decades ago when the areas were zoned for more dense use (or were not zoned at all).

*Id.* (internal quotation marks omitted).

The Commission's reasoning in the present case suffers from the same flaw as the reasoning we disapproved in *Durant III*. Just because the FLUM's description of moderate-density commercial refers to the C-2-B zone, and a PUD in the C-2-B zone in turn can include a building up to ninety feet high (and thus presumably nine stories tall), that does not mean that such buildings are generally appropriate in a moderate-density commercial area. The clear and straightforward language of the FLUM is directly to the contrary: buildings in areas designated as moderate-density commercial "generally do not exceed five stories in height." 10-A DCMR § 225.9 (2020).

To be clear, we are not holding that a building of over five stories can never be placed in an area designated on the FLUM as medium-density commercial. The FLUM designation is not worded in mandatory terms, as reflected by the FLUM's use of the word "generally." 10-A DCMR § 225.9 (2020). The Commission may end up permissibly concluding that more important policies reflected in the Comprehensive Plan outweigh the non-binding guidance of the FLUM in a given case. What the Commission failed to appreciate in the present case, however, is that

the FLUM designations of the surrounding areas weigh against the proposed PUD in this case. The Commission must take that consideration into account when deciding whether the PUD in this case is on balance consistent with the Comprehensive Plan and whether the benefits of the PUD outweigh the PUD's adverse effects.

## C.

We have explained that the Commission's order was erroneous in several respects. In such cases, the ordinary remedy is to remand the matter to the agency for further consideration. *See, e.g.*, *Apartment & Office Bldg. Ass'n*, 129 A.3d at 930 (Generally, "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained.") (internal quotation marks omitted). "[R]emand is not required in cases where the agency would doubtless reach the same result and reaffirm its prior order." *Id.* We are unable to conclude in this case, however, that the Commission would doubtless reach the same result if the errors and omissions we have noted are corrected.

The concurring/dissenting opinion suggests that the Commission thought the benefits of the PUD so heavily outweighed any adverse effects of the PUD that the Commission surely would have approved the PUD. *Infra* at 34-35. The difficulty with that theory is that the Commission's order does not reflect an accurate understanding of what the adverse impacts of the PUD might be, and we therefore do not know what the Commission would have done if the Commission had had an accurate understanding of those adverse impacts. Thus, the Commission's order does not do what we have said the Commission must: "recognize[] these conflicting policies and explain[] why they are outweighed by other, competing considerations." *FOMP III*, 211 A.3d at 146 (brackets and internal quotation marks omitted). In such circumstances, our cases ordinarily require us to remand to the Commission. *See, e.g.*, *Durant I*, 65 A.3d at 1169 ("As a reviewing court, we are not in a position to decide whether the Commission would have balanced these considerations in the same way if it had recognized that approval of the developer's application would have caused a greater incursion into low-density residential areas.").

For the foregoing reasons, we remand the case for the Commission to (1) take into account that the ninety-foot-high building protrudes into a Neighborhood Conservation Area; (2) take into account that the areas adjacent to the western portion of the PUD are designated moderate-density residential, not medium-density

residential; (3) take into account that the ninety-foot-high building and the sixty-foot-high building are not generally consistent with, respectively, the medium-density-commercial and moderate-density-residential designations in the FLUM; (4) either identify record support for the statement that the senior building "mimics many other apartment houses that have been built as infill developments in the area" or forgo reliance on that consideration; (5) independently analyze and discuss whether the PUD is inconsistent with specific policies, or would have adverse effects, timely identified before the Commission; (6) determine whether, in light of the Commission's conclusions on these issues, the Commission should grant or deny approval of the PUD; and (7) explain the Commission's reasoning in granting or denying approval.

## III.

Although we have concluded that remand is necessary for the reasons we have stated, we also exercise our discretion to address three arguments raised by petitioners upon which we conclude that relief is not warranted.

**A.**

Petitioners argue that the Commission failed to obtain reports from District agencies that the Commission was required to consider before deciding on the PUD application. We conclude, however, that this argument was not properly preserved before the Commission.

As previously explained, although OP sought input from many District agencies, no agency provided input to OP before OP submitted its report, and only the Department of Transportation submitted written comments before the hearing. After an objection was raised at the hearing to the lack of written reports, the Department of Energy and Environment, DC Water, FEMS, and DHCD submitted brief statements or emails expressing views about the application. Once the additional materials were submitted, petitioners and other parties had ample opportunity to raise a post-hearing objection that the materials were belated or otherwise inadequate. As far as we have been able to determine, however, no such objection was presented to the Commission. Understandably, the Commission did not address the issue. Under the circumstances, we hold that the issue was forfeited and is not a proper basis for relief. *Cf., e.g.*, *Cole*, 210 A.3d at 763-64 (declining to consider challenge to adequacy of written reports, because issue was not properly

presented to Commission); *see generally, e.g.*, *DC Appleseed Ctr. for Law & Justice v. District of Columbia Dep't of Ins., Sec. & Banking*, 214 A.3d 978, 986 (D.C. 2019) ("In the absence of exceptional circumstances, a reviewing court will refuse to consider contentions not presented before the administrative agency at the appropriate time.") (internal quotation marks omitted).

**B.**

Petitioners further argue that the Commission acted impermissibly by itself effectively changing the site's designation on the FLUM from a Local Public Facility to residential and commercial use, because in petitioners' view such a change requires legislation. This argument too does not appear to have been presented to the Commission, which therefore did not address the issue. We decline to consider this argument, particularly given that the Council of the District of Columbia passed resolutions declaring the pertinent portion of the site to be surplus and approving the sale of that portion for the purpose of building a mixed-use development. *See* D.C. Council Resolution 21-720, Bruce Monroe Surplus Property Declaration Resolution of 2016, 64 D.C. Reg. 431 (2017); D.C. Council Resolution 21-721, Bruce Monroe Disposition Approval Resolution of 2016, 64 D.C. Reg. 10453 (2017).

**C.**

Finally, we address petitioners' argument that the record did not adequately support the Commission's finding that the PUD's proposed building heights and density were necessary to achieve the affordable-housing goals of the project. To the contrary, we conclude that Commission adequately grounded that finding in substantial evidence, including evidence specifically explaining why other approaches would not be feasible. *See generally, e.g.*, *Cole*, 210 A.3d at 760 ("This court's review of the Commission's decision is deferential. . . . Absent a material procedural impropriety or error of law, the Commission's decision stands so long as it rationally flows from findings of fact supported by substantial evidence in the record as a whole.") (internal quotation marks omitted).

\*          \*          \*          \*          \*

For the foregoing reasons, we vacate the Commission's order and remand for further proceedings.

*So ordered.*

THOMPSON, *Associate Judge*, concurring in part and dissenting in part: The planned unit development (the "PUD" or the "Project") proposal approved by the Zoning Commission ("Commission") in this case calls for constructing one-for-one replacement housing for tenants living in the distressed Park Morton public housing project, as well as a mix of other affordable and market-rate housing and a building for senior citizens, on a "Local Public Facility" site owned by the District of Columbia. A public school formerly occupied the site, and during the decade or so since the school building was demolished the District has permitted neighbors to use the site – a temporary park – for a community garden, dog-walking, and recreational uses. The Commission's Order unanimously approving the PUD requires the District to set aside more than an acre of the former public school site for public "park and recreation uses."

During their deliberations on the PUD application, the Zoning Commissioners remarked that the proposed PUD is a "very important," "very significant," and "very worthy" project that is "well-needed." One Commissioner called the Project the "epitome of what a new community project should be," and another joined in those "laudatory comments." The Commission concluded that the PUD is consistent with the Comprehensive Plan, including the Comprehensive Plan's policy declaring that affordable housing production is a civic priority. The Commission added, however, that even if the proposed density, scale, and building heights involved in the Project

are inconsistent with portions of the Comprehensive Plan, the Commission "would still conclude that the overall Project is consistent with the Comprehensive Plan based on the numerous goals and policies that the Project's development program embodies and advances." That conclusion in the Order may have been drawn verbatim from the proposed findings submitted by the applicant's counsel, but the Commissioners' comments quoted above leave no room for doubt that the Commission embraced that conclusion.

The majority opinion vacates the Commission's Order approving the PUD, however, for a number of reasons that I believe do not warrant that result.

I do agree with my colleagues that the Commission's Order contains a number of erroneous statements. One example is the Order's mistaken reference to the Future Land Use Map (the "FLUM") as "designat[ing] properties to the immediate north and west . . . of the PUD Site as Medium-Density Residential" instead of moderate-density residential. Another example is the Order's imprecise reference to the PUD site as being "surrounded by Moderate Density Commercial and Medium Density Residential designations," even though this is true only as to the eastern and northeastern portion of the PUD site. In Finding # 125, the Order curiously begins by discussing the Moderate-Density Commercial Designation and ends by referring to the Medium Density Commercial Designation, apparently by mistake.

However, despite the mistaken or imprecise references, I believe the record makes it sufficiently clear that Commissioners understood that the areas adjacent to the western portion of the PUD site are designated as moderate-density residential[1]: the Office of Planning's witness and report noted that the FLUM recommends "moderate density residential for the west side" of the PUD site; applicant's application acknowledges the same; applicant's land-use expert made this point in his testimony, referring to the "moderate density residential that exists to the north and to the west" of the PUD site as did petitioner Chaudhary in her testimony, stating that "the area is zoned for moderate density"; the Commission's Order acknowledges the "existing lower-scale residential neighborhood to the north and west"; Commissioner Miller's remarks show that he understood that the designation is "moderate density residential . . . where the townhouses are going . . . [and] the senior building"; and the Commission's Order states that the ninety-foot building "steps down to relate to the existing lower-scale residential neighborhood to the north and west," a remark that must reasonably be read to denote that the neighborhood to the north and west of the PUD site is a lower-density residential

---

[1] *Cf. Ayeni v. Holder*, 617 F.3d 67, 72 (1st Cir. 2010) (reasoning that "[a] single mistaken statement about a subsidiary fact" did not constitute an error of law where, although agency decision alluded at one point to the petitioner's "'three' children," a later statement in the decision made clear that the agency knew perfectly well that the petitioner had a fourth child).

neighborhood than the medium-density residential area to the east. In light of all these references, I see no reason to think that the Commission was misled by the mistaken references, and I have no doubt that the Commission would reach the same decision after correcting the errors, especially in light of (what my colleagues and I agree is) the substantial evidence supporting the Commission's conclusion that the PUD's proposed building heights and density are necessary to achieve the Project's affordable-housing goals. But, given that my colleagues are unpersuaded, I do not oppose a remand for the limited purpose of having the Commission correct its misstatements about the zoning designations surrounding the PUD site and indicate whether the correct information changes its resolution of the PUD application. If it does not, the approval should stand.

In my view, none of the other criticisms the majority opinion levels at the Commission Order is "sufficiently significant to require a remand[.]"[2]

The majority opinion begins its critique by stating that the Commission "did not explicitly identify a single respect in which the PUD as approved would have an adverse effect or would be inconsistent with a policy in the Comprehensive Plan." I would emphasize two counterpoints in response. The first is that where the PUD *as*

---

[2] *Durant v. District of Columbia Zoning Comm'n*, 65 A.3d 1161, 1163 (D.C. 2013) ("*Durant I*").

*proposed* would have had an adverse effect, the Commission declined to approve the offending aspect of the proposal. For example, in Finding # 81, the Commission agreed that the Project would have "adverse effects on neighborhood parking" and therefore declined to approve the applicant's "requested flexibility related to [the number of] parking spaces[.]" The PUD as proposed mentioned the District's additional plan to preserve an acre of park space for the neighborhood but stated that this "was not part of th[e] application." The Commission Order, however, addressed the reduction of existing park space by requiring that the ground lease to the developer/applicant include a provision setting aside approximately 44,000 square feet of land adjacent to the PUD site for park and recreation uses for the life of the ground lease.

The second point is that my colleagues' criticism overlooks the many ways in which the Order implicitly acknowledges the adverse impacts described by the opponents of the PUD application.[3] For example, in its Finding # 104 the

---

[3] This court has repeatedly relied on an agency's implicit findings and reasoning to uphold an agency decision. *See, e.g.*, *Panutat v. District of Columbia Alcoholic Bev. Control Bd.*, 75 A.3d 269, 279-80 (D.C. 2013) (noting that consideration of the relevant statutory factors was implicit in the Board's ruling); *Washington Gas Light Co. v. Public Serv. Comm'n*, 452 A.2d 375, 384 (D.C. 1982) (concluding that the agency's implicit finding as to sales growth was sufficient to avoid setting aside the agency's decision). We have held that because the Zoning Commission is obligated to give "great weight" to the issues and concerns raised by

Commission discussed the sixty-foot setback of the planned seniors building, a "setback distance that is equal to the height of the senior building[,]" and the new private street that will separate that building from the closest row dwellings. The discussion implicitly recognizes concerns about the height disparity between the proposed senior building and the existing townhouses and about respecting and maintaining the scale of the existing rowhouse neighborhood to the immediate west of the PUD site. In Findings # 137 and # 138, the Commission's Order implicitly acknowledged what petitioners forecast to be the "over concentration of population" on the PUD site, explaining that the density is necessary to successfully implement the build-first principle, minimizing displacement for residents of the Park Morton public housing project. Many other examples could be cited. It is true that the Commission was satisfied that all of the opponents' concerns were adequately addressed, could be mitigated, or were outweighed by the benefits of the Project,

Advisory Neighborhood Commissions, it must "provide[] a reasonably precise explanation for any disagreements with them." *Spring Valley-Wesley Heights Citizens' Ass'n v. District of Columbia Zoning Comm'n*, 88 A.3d 697, 705 (D.C. 2013). By contrast, as to concerns expressed by others, the implication is that the Commission may adequately address the concerns through implicit findings and reasoning, as long as its path can reasonably be discerned. *See Bowman Transp., Inc. v. Arkansas-Best Freight System*, 419 U.S. 281, 286 (1974) ("[W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."); *Spring Valley-Wesley Heights Citizens' Ass'n*, 88 A.3d at 705 ("[I]f we can discern with reasonable clarity the reasons for the decision, the agency has fulfilled its duty of explanation[.]") (internal quotation marks omitted).

but, of course, the law did not require the Commission to agree that any of the adverse impacts was fatal to the PUD application.

The majority opinion next faults the Commission for not acknowledging that "[a] substantial portion of the proposed ninety-foot-high apartment building [proposed to be built on the northeast corner of the PUD site, at Georgia Avenue and Irving Street, N.W.] would extend into" or "protrude substantially into" what the Generalized Policy Map ("GPM") identifies as a Neighborhood Conservation Area on the western portion of the PUD site. The GPM does show the western portion of the PUD site as in a Neighborhood Conservation Area, and it does appear that a portion (petitioners allege the western third) of the ninety-foot building extends into that area. *See* 10-A DCMR § 223.3. Significantly, however, the GPM does not show that the PUD site is publicly owned land on which a school formerly stood and where a park now exists, facts that distinguish it from the adjacent portions of the Neighborhood Conservation area.[4]

Further, and more importantly, per 10-A DCMR § 223.2, the boundaries on the GPM "are to be interpreted in concert with" the Comprehensive Plan text, the

---

[4] Neighborhood Conservation areas "are primarily residential in character[.]" *Durant I*, 65 A.3d at 1163 n.5 (quoting 10-A DCMR § 223.4, .5).

FLUM, and other Comprehensive Plan maps[.]" On the FLUM, the PUD site is shown as a "Local Public Facility" rather than as part of the (moderate-density) residential area that the GPM shows as co-extensive with the Neighborhood Conservation Area. The Commission emphasized the PUD site's FLUM designation as a Local Public Facility in explaining why the applicant's requested zoning map amendment (creating a C-2-B zone district in the eastern portion of the PUD site and an R-5-B zone district in the western portion of the site) is appropriate and consistent with the FLUM. It also credited the testimony of a land use, planning, and zoning expert that the PUD is consistent with the PUD site's FLUM designation, which it noted "does not show density or intensity on Local Public Facilities sites." As the Commission's Order notes, the Comprehensive Plan directs that "[i]f a change in use occurs [on a Local Public Facility site] in the future (for example, a school becomes surplus or is redeveloped), the new designations should be *comparable* in density or intensity to those in the *vicinity*"– i.e., not necessarily identical to any of the adjacent designations. 10-A DCMR § 226.1(h) (emphasis added).[5] The Commission applied that regulation "by comparing the proposed PUD

---

[5] The term "vicinity" is somewhat vague, but we have treated the term as referring not just to immediate surroundings and as broad enough to include an adjacent neighborhood. *See, e.g.*, *Cathedral Park Condominium Comm. V. District of Columbia Zoning Comm'n*, 743 A.2d 1231, 1244 (D.C. 2000) (referring to regulation stating that buildings should be constructed to a height roughly equal to the average height of buildings in the "vicinity," and upholding Commission

Site density to the surrounding neighborhood context, including existing and approved PUDs[.]" The Commission reasoned that there is "no reason to believe" that the Moderate-Density Commercial and Medium-Density Residential designations, which exist to the immediate east and northeast of the PUD site on both sides of Georgia Avenue, (and which, I note, are not in a Neighborhood Conservation Area) "would have been cut off at the PUD Site if it were not already designated as a Local Public Facility." Petitioners assume that the western portion of the PUD Site "must . . . logically adopt the FLUM's Moderate-Density residential designation . . . [that] surrounds the PUD site to the north, west, and south," but I see no reason why this court should accept that "logic" or interpretation rather than defer to the interpretation the Commission found persuasive.

My colleagues in the majority are correct that the Commission did not specifically mention the ninety-foot building's protrusion into the Neighborhood Conservation Area. But the Order's emphasis on the significance of the PUD site's FLUM designation as a Local Public Facility—along with its reference to the Comprehensive Plan's direction that new zoning on a site with that designation

―――――――――――――――

determination that proposed building height was acceptable because it was consistent with the height of buildings on Connecticut Avenue in the Cleveland Park and Woodley Park neighborhoods). Here, the Commission emphasized "the PUD Site's location along the Georgia Avenue corridor."

should be comparable in density to zoning in the vicinity (here, including the Georgia Avenue corridor) and its expressed view that the designations on both sides of Georgia Avenue and the existence of built and approved PUDs in the area are pertinent to how the Local Public Facility PUD site may be developed—enable us to discern the Commission's reasoning on the "protrusion" point: that the GPM's Neighborhood Conservation Area boundaries do not strictly govern the PUD site given its status on the FLUM as a Local Public Facility site.[6] For that reason, I cannot agree that the Commission's not having specifically acknowledged the protrusion is an omission making a remand appropriate. I would defer to the Commission's view that it is enough that the ninety-foot building (including the portion that would protrude into what the GPM shows as a Neighborhood Conservation Area, though the Commission did not say so) would be comparable in density or intensity to buildings "in the vicinity"—i.e., comparable to buildings in the mixed-use area on Georgia Avenue.

---

[6] At the same time, the Commission Order explains that the western portion of the proposed PUD "is consistent with the Neighborhood Conservation Area designation on the [GPM]" and "with the objectives set forth for Neighborhood Conservation Areas[,]" as the southwestern-most portion will include new townhomes that will "enhance the established neighborhood" and the northwestern-most portion will include the set-back senior building that will "respect and maintain the scale and character of the surrounding neighborhood."

The majority opinion next takes issue with the Commission's statement that the senior building "mimics many other apartment houses that have been built as infill developments in the area." The word "mimic" may be unduly subjective and the word "many" seems excessive, but the record shows that there are at least two already-constructed residential buildings in the vicinity of the PUD site that have a height similar to the proposed sixty-foot height of the planned senior building. One shown in the record is the seventy-three-foot building, situated among rowhouses and known as "The Avenue" located at 3506 Georgia Avenue. Another is the eighty-foot building at 3232 Georgia Avenue. Moreover, other portions of the Order make the more precise statement that there are "a number of existing and approved apartment buildings in the immediate vicinity of the PUD Site that have heights within the 72-90-foot range." A schematic drawing showing "New Development Along Georgia Avenue" depicts several of the built or approved buildings, and the hearing testimony contains many references to these similar-height buildings. Given these existing or proposed buildings on Georgia Avenue, the Commission could reasonably conclude that the PUD would entail development, in the PUD-site portion of a block that is to the immediate west of Georgia Avenue, that is "compatible with the existing scale and character" in the vicinity.

My colleagues also conclude that the Commission "failed to appreciate . . . that the FLUM designations of the surrounding areas weigh against the proposed PUD[.]" Quite the contrary, such an appreciation is implicit in the Commission's analysis of why the ninety-feet and sixty-feet buildings are nevertheless appropriate for the area. The Commission resolved what it found is an inconsistency between the PUD height limits permitted in certain zone districts (*see* 11 DCMR § 2405.1) and the Comprehensive Plan's and FLUM's listing of those zone districts in residential and commercial categories that typically feature low-rise buildings (*see* 10-A DCMR §§ 225.4, .5, .9). I believe the Commission's analysis is a sensible one that deserves deference. Nor does the Commission's Order "suffer[] from the same flaw" this court disapproved of in *Durant v. District of Columbia Zoning Comm'n*, 139 A.3d 880 (D.C. 2016) ("*Durant III*"). There, the Commission found that a proposed PUD "would be a 'moderate-density residential development.'" *Id.* at 882. Here, by contrast, the Commission did not conclude that the PUD would be a moderate- or medium-density development. Rather, it explained why it found that the PUD buildings would have numbers of stories "consistent with the number of stories that could be built in the zone districts listed [in 10-A DCMR § 225] as being consistent with" the commercial and residential designations of the areas adjacent to the eastern side of the PUD site.

I also feel compelled to express my disagreement with the notion that there is something automatically suspect about the Commission's adoption of a party's proposed findings with which the Commission agrees—which is a "not . . . infrequent practice of courts and agencies[.]"[7] According to the Commission's website, most or all of the Commissioners have other, demanding full-time jobs. Intervenor's brief asserts that the Commission "operates without dedicated personnel to draft orders[.]" I do not know whether that is accurate, but if it is, it is yet another reason why no negative inference should be drawn from the Commission's verbatim use of a party's proposed findings. In any event, I disagree with my colleagues' concern that the Commission's Order does not reflect "independent consideration by the Commission[.]" The record speaks for itself with respect to the Commission's not-careful-enough adoption of some erroneous portions of the applicant's proposed findings. But the record belies any suggestion that the Commission accepted the applicant's representations without analysis. For example, the Commission did not assume that the PUD site should be used for housing even though the adjacent areas are either moderate-density residential or medium-density residential. Rather, it required the applicant to provide further explanation regarding "why residential use is appropriate for the PUD Site, given the PUD Site's designation on the [FLUM] as a Local Public Facility."

---

[7] *Durant I*, 65 A.3d at 1168 n.12.

For all the foregoing reasons, I believe the criticisms of the Commission's Order in the majority opinion are overblown. I would not allow them to be a roadblock to what the Commission found to be this "very important" Project. My colleagues direct the Commission to analyze anew "whether the PUD is inconsistent with specific polices, or would have adverse effects, timely identified before the Commission." This, I predict, is a formula for another round of appeals that will delay a project that the Commission has already thoroughly analyzed and unanimously deemed worthy of approval.